687 S.E.2d 746 (2009)
The Matter of B.B., K.B., T.B., P.B., J.B., B.B., and T.F.
No. 34599.
Supreme Court of Appeals of West Virginia.
Submitted September 9, 2009.
Decided October 9, 2009.
Concurring Opinion of Justice Workman October 26, 2009.
Concurring Opinion of Chief Justice Benjamin December 22, 2009.
*747 Brian J. Vance, Romney, WV, for the Petitioner, Rosemary C.
Marla Zelene Harman, Franklin, WV, Joyce E. Stewart, Moorefield, WV, Guardians ad litem on behalf of the minor children.
Darrell V. McGraw, Jr., Attorney General, Charleston, WV, C. Carter Williams, Assistant Attorney General, Moorefield, WV, for the Respondent, West Virginia Department of Health and Human Resources.
PER CURIAM.
The respondent below and appellant herein, Rosemary C. (hereinafter "Rosemary"), appeals from an order entered July 3, 2008, by the Circuit Court of Mineral County. By that order, the circuit court denied Rosemary's motion for a post-dispositional *748 improvement period and terminated any parental rights to Tiffany B.[1] (hereinafter "Tiffany"), Patricia B. (hereinafter "Patricia"), Joshua B. (hereinafter "Joshua"), Brandon B. (hereinafter "Brandon"), and Tessa F. (hereinafter "Tessa"), all children to whom Rosemary had no biological relation.[2] The lower court's order further denied post-termination visitation. On appeal to this Court, Rosemary argues that the circuit court erred in denying her post-dispositional improvement period and in terminating her parental rights. Rosemary also alleges some procedural improprieties that will be discussed in this opinion.[3] Based on the parties' arguments, the record designated for our consideration, and the pertinent authorities, we affirm the rulings made by the circuit court.

I.

FACTUAL AND PROCEDURAL HISTORY
The petitioner, Rosemary, is currently in her mid-seventies and her son, Hiram, is in his mid-forties. Previously, the two lived together in Baltimore, Maryland. While living in Maryland, Rosemary and Hiram came to care for seven children, none of whom were related by blood or marriage to either Rosemary or Hiram.[4] The biological parents[5] of the children were drug addicts and were acquaintances with one of Rosemary's biological children. When the biological parents could not care for their children, Rosemary would take informal temporary custody. This process Continued as each of the six sibling children were born and with the one child who was unrelated to the other six children. Rosemary was granted legal custody and guardianship of the children in the Circuit Court of Baltimore City Division for Juvenile Cases in April 1999; however, the biological parents' rights were never terminated by the Maryland courts. The Maryland court terminated its jurisdiction over the matter in 2006.
In 2001, Rosemary and Hiram moved to West Virginia with these seven children. Soon thereafter, in March 2001, the children were brought to the attention of Child Protective *749 Services (hereinafter "CPS"). Over the next several years, eleven different referrals were sought for various reasons. The referrals were investigated and some of the allegations contained therein were unsubstantiated. However, the referrals that were substantiated included instances of emotional abuse, physical abuse, improper threats of sending the children away for bad behavior, improper punishment by withholding food, illegal drug abuse in the home by adults, an unhealthy home with cockroaches falling from the ceiling, farm animals in the home, flea infestation resulting in bites to the children, and failure on Rosemary's part to complete the paperwork necessary for medical coverage for the children. Moreover, one of the children, Patricia, is ill with Hepatitis C.[6] It was found that this child was forced to use a bucket outside of the home as separate toilet facilities. She was also forced to use different eating and drinking utensils from the rest of the family. The Department of Health and Human Resources (hereinafter "DHHR") also noted its concerns about the children living in the same home as adults with extensive criminal backgrounds.[7]
Based upon these referrals and concerns, a general abuse and neglect petition was filed by the DHHR against Rosemary on June 12, 2007.[8] In addition to Rosemary, other parties included in the underlying proceedings were the biological parents of the six sibling children, as well as the biological mother of the other child who was unrelated to the other six children.[9] During the court proceedings in West Virginia, the biological parents' rights to the six sibling children were terminated on December 12, 2007.[10] The biological mother's rights to Tessa are still pending in the circuit court. Of the seven children in Rosemary's care, only three of them are at issue before this Court, all of whom are related to each other by blood but are not related to either Rosemary or Hiram by blood. The three children at issue in this appeal are Brandon, born 1993; Patricia, born 1995; and Joshua, born 1999.[11]
*750 As early as September 2004, the family was referred for various services including Family Preservation, Juvenile Probation, and Youth Services. Parenting plans were designed and counseling was ordered. It was found that Rosemary and Hiram initially were not compliant in taking advantage of these ordered programs. It was also found that Rosemary and Hiram were not compliant with the court-ordered sibling visitation with siblings who had been removed from the home on juvenile petitions. During the lower court proceedings, it was found that Rosemary had a habit of filing juvenile petitions on the children as they got older. The lower court specifically found that
[a]s soon as a child gets old enough to report abuse, Rosemary would file a juvenile petition to get rid of and punish the child. That child is then shunned by Rosemary and Hiram.
Once a child is on the "shunned list", there is an effort to exclude that child from her [or his] siblings.
As a result of the June 2007 abuse and neglect petition, the DHHR was granted legal custody of the children, but physical custody remained with Rosemary. A status hearing was held August 31, 2007, regarding a Motion for Contempt filed against Rosemary, wherein the lower court ruled that Rosemary was in contempt for intentionally interfering with sibling visitation that had been previously ordered to occur between the children remaining in her care and their sibling sister who had been removed from the home on a juvenile petition. Because Hiram's actions also contributed to the lack of compliance with visitation, he was also subjected to the same continuing terms and conditions as Rosemary.
In September 2007, an amended abuse and neglect petition was filed by the DHHR. This petition alleged that Rosemary had allowed the children's medical cards to lapse. The DHHR was granted physical custody of the children due to this failure by Rosemary, which resulted in the children being denied continued services from Family Preservation Services and Mountain State Psychological. The children were removed from the home and placed in various foster homes, with only Joshua and Patricia remaining together in the same placement.
On October 3, 2007, an adjudicatory hearing was held and the parties informed the lower court that they had reached an agreed adjudication for the trial court to approve. The stipulations of the parties included Rosemary's concessions that the children had been exposed to inappropriate discipline in her home, resulting in both physical and emotional abuse. She further agreed that she had failed to participate with in-home services and social services recommended by the DHHR; and that the living conditions in her home had been less than adequate for the health, benefit, and welfare of the children. The lower court made a finding that the minor children were abused and/or neglected children and that continued physical custody by Rosemary was not in the children's best interests. The lower court granted a six-month post-adjudicatory improvement period to Rosemary. In that time, Rosemary was directed to participate in counseling recommended by her psychological evaluation and to attend all counseling, medical, psychological, psychiatric, and parenting appointments or sessions determined necessary by the MultiDisciplinary Team (hereinafter "MDT"). The goals were to address the necessary parenting issues needed to protect the children, to improve the living conditions in the home, and to maintain current medical cards on the children.
The DHHR filed its Family Treatment Plan on February 14, 2008. The plan included the following eight items that must be remedied during the improvement period:
1. Rosemary and Hiram have a history of not following through with services which resulted in the removal of the children from the family home.
2. Rosemary and Hiram file incorrigibility petitions on the children when they reach a certain age, indicating that the child is out of control. The child is then shunned by the other children because Rosemary and Hiram tell them not to speak to the child.

*751 3. The family home is in disarray and through reports of service providers there are cockroaches everywhere crawling on the floors, walls and falling from the ceiling this creates an unhealthy environment for the children to live in due to cockroaches carrying disease.
4. The children report physical and emotional abuse as evidenced by reports of being pushed down the stairs, pushed against the walls, beat up by the other children while being held down by Hiram. Patricia has indicated that she had to toilet in a bucket in the home and was not allowed to use the family bathroom. The bucket was moved to a trailer outside and she was forced to use that. Patricia was also told regularly that she would die by the time she is sixteen. The other children report that Hiram would get angry with them and hang a sign on his door that he is not their father and they have to call him by his given name. Hiram and Rosemary do not permit the children to associate with black children because they do not like them. If caught the children are shunned.
5. The children have reported that [various other adults] would stay at the home and use drugs with Hiram. When this would happen the children were exposed to people being passed out and possibly overdosing on the drugs.[[12]]
6. Hiram and Rosemary have not recognized the problems in the home. They have not realized the impact that their actions and words have had on the children. They do not feel the children have been abused emotionally or physically. They view themselves as the victims in the case. They feel the children are being allowed to run the court and MDT and that the MDT should not be listening to the children's wishes although all of the children at one time or another have expressed that they do not want to return to the family home.
7. The children have many concerns about returning home. They are concerned about the treatment they would receive if they return to the family home.
8. Hiram does not have any means of support.
(Footnote added).
On April 16, 2008, a status hearing was held to review the improvement period and the case plan. Rosemary's counsel's motion to meet with the children, in the presence of their guardian ad litem, was granted for the purpose of ascertaining the children's wishes on where they would like to reside. The same counsel also made a request for Hiram to receive independent court-appointed counsel, which was denied.[13] DHHR was requested to file the Children's Case Plan by June 1, 2008. In an order entered June 13, 2008, the circuit court acknowledged receipt of the DHHR's Children's Case Plan. In that plan, the DHHR stated that
[w]hile participating in services the MDT has seen a significant amount of improvement from both Hiram and Rosemary. They have become more open to the children and dealing with them at their present ages. They have acknowledged a lack of information regarding Patricia's illness and apologized for their treatment of her during a family session. Both Hiram and Rosemary have listened to what the children have to say and how the children are feeling and then address the issues at hand. Both have learned to recognize the need to work together on the disciplining of the children so that the children can not triangulate the situation to achieve whatever goal they may have at the time. The children have become increasingly comfortable with Hiram and Rosemary. They have been able to express their fears without concerns of being shunned by Hiram. The children have had moments of wanting to return to the home and other moments of wanting to remain in foster care. Due to the family's successful completion of the treatment plan, the Department has no *752 alternative but to recommend reunification of the children with Hiram and Rosemary[.]
Therein, the DHHR recommended a reunification plan with the goal to transition Tiffany, Patricia, Joshua, and Brandon, upon completion of his residential treatment program, back to Rosemary's home. In its June 13, 2008, order, the circuit court advised that it did not agree with the DHHR's assessment of the case and that it had reservations about the permanency plan for the children. Therefore, the lower court directed that the dispositional hearing scheduled for June 19, 2008, be held pursuant to W. Va.Code § 49-5D-3a (2004) (Repl. Vol. 2004)[14] and that the MDT should present evidence as to its rationale for the proposed service plan.
A dispositional hearing was held June 19, 2008. Testimony was heard from the child protective services worker, a clinical therapist who provided individual and family therapy, a case manager and counselor who provided parenting training, and two psychologists who provided therapy to the children. All of the witnesses indicated their recommendation that reunification be attempted between the children and Rosemary. At the conclusion of the testimony, all counsel, including the children's guardian ad litem, recommended that the children be returned to Rosemary's home with continued services and oversight by the DHHR. The matter was taken under advisement by the lower court, which set forth its findings of fact and conclusions of law in its Dispositional Hearing Order entered July 3, 2008. In its order, the lower court stated that
in this case there is ample evidence already in the record to show that the treatment goals have not been met, that the Department [DHHR] chose to ignore significant facts, that both respondents testified falsely, and that the best interest of these children will not be served by returning them to this strange home.
(Emphasis in original). The lower court's order emphasized its conclusions that Rosemary and Hiram failed to follow through with services, that they filed incorrigibility petitions on children when they reach a certain age and then shun that child, that the house is in disarray with little or no food and a flea infestation problem, that Hiram and Rosemary have failed to appreciate the extent of the physical and emotional abuse suffered by the children as a result of their actions and inactions, that the children were exposed to illegal drug abuse by adults in the home, and that Hiram and Rosemary view themselves as victims and fail to understand the impact of their behavior on the children. Moreover, the children, during an interview with the court on June 12, 2008, indicated their fear and concern about treatment they would receive if they were returned to the home, as well as the treatment they would receive if they did not want to return home, including Rosemary and Hiram's anticipated refusal to let them visit any of their siblings who might have returned to the home. The lower court's order further identified as a major concern that Hiram has no means of support, and identifying that there is a question as to whether Hiram and Rosemary can afford to feed and clothe the four children at issue.[15] Significantly, in regards to the current placements *753 of the children outside of the home, the lower court order found that "[a]ll of these children continued to improve until contact with Hiram and Rosemary was increased. Their behavior then deteriorated." (Emphasis in original).
The disposition in the lower court's order was stated as follows:
The Court has seriously considered whether to grant a dispositional period of improvement. However, the Court denies the request for the following reasons:
1. There is no reason to believe that [Rosemary and Hiram] will change as has been set forth previously.
2. Any trial placement back in the home that didn't work out would disrupt and possibly make return to current placements for the children impossible.
3. The children have regressed when they are around Rosemary and Hiram.
4. Given what has happened in this case, this Court simply cannot trust the members of this MDT to recognize and report to the Court if something were to go wrong.
The order directed "[t]hat any parental rights, including visitation of Rosemary ... and Hiram ... to Tiffany ... Patricia ... Joshua ... Brandon ... and Tessa ... are hereby TERMINATED." The lower court further denied requests for post-termination visitation stating that "further visitation is not in the children's best interests. It is clear from the reports ... that the children regress when they have contact with Hiram and Rosemary.... The children need a clean break." DHHR was ordered to provide for significant visitation among the children. It is from this order that Rosemary appeals to this Court.
Subsequent to the lower court's dispositional order, the DHHR has now filed a response with this Court wherein it alters the earlier recommendation made to the lower court. Because the children have improved so dramatically in their current placements, and because they seem to regress when they have any contact with Rosemary, DHHR is now advocating that the children remain in their current placements and that visitation with Rosemary occur only at the discretion of the individual children. Additionally, two new guardians ad litem subsequently were appointed because the original guardian ad litem took a public office and could no longer be involved in the case.[16] The two new guardians performed their own independent assessment, including home visits and interviews. Their opinions are that the children's best interests are to sever all contact with Rosemary and Hiram. The two guardians opine that there is ample concern for continuing emotional problems for the children and also conclude that the home is unsafe and uninhabitable for children. They do not recommend visitation. The guardians ask this Court to remand the case for the lower court to continue proceedings in accordance with its dispositional order so that permanency can be achieved for the children.

II.

STANDARD OF REVIEW
This case is before this Court on appeal from the circuit court's order denying Rosemary's request for a post-dispositional improvement period and denying her request for post-termination visitation. This Court has previously explained that, in the realm of an abuse and neglect case,
[a]lthough conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite *754 and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.
Syl. pt. 1, In the Interest of: Tiffany Marie S., 196 W.Va. 223, 470 S.E.2d 177 (1996). Mindful of the applicable standards, we proceed to consider the parties' arguments.

III.

DISCUSSION
On appeal to this Court, Rosemary argues that the circuit court erred in denying her post-dispositional improvement period and in terminating her parental rights. Rosemary also alleges some procedural improprieties. Specifically, Rosemary asserts that the trial judge improperly obtained the testimony of the children and used these statements in violation of Rule 8 of the Rules of Procedure for Child Abuse and Neglect Proceedings.[17] Further, she contends that the lower court improperly considered her modest income in deciding whether to terminate rights.[18] She also contends that the dispositional order was improperly entered more then ten days from the hearing date in violation of Rule 36 of the Rules of Procedure for Child Abuse and Neglect Proceedings.[19] Finally, because her son, Hiram, was also included in the improvement periods, Rosemary *755 contends that he should have been appointed counsel.[20]
Initially, the DHHR and the original guardian ad litem advocated for the return of the children to the care of Rosemary, and this was the position advanced during the underlying proceedings. However, because these children have been in the same placement since 2007 and are doing extremely well and only seem to regress with any contact with Rosemary, the DHHR is now advocating that the children remain in their current placements and that visitation with Rosemary occur only at the discretion of the individual children. The current guardians ad litem concur with the position of the DHHR expressed on appeal to this Court, with the exception that the guardians recommend that no visitation occur between the children and Rosemary.
As previously explained by this Court, "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589 (1996). Further guidance is provided as follows:
"`Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va.Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, In re R.J.M., 164 W.Va. 496, 266 S.E.2d 114 (1980). Syllabus point 4, In re Jonathan P., 182 W.Va. 302, 387 S.E.2d 537 (1989)." Syllabus Point 1, In re Jeffrey R.L., 190 W.Va. 24, 435 S.E.2d 162 (1993).
Syl. pt. 7, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589. Further, "`courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened....' Syl. Pt. 1, in part, In re R.J.M., 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. pt. 7, in part, In the Interest of Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991). Thus, this Court elevates the health and welfare of the children above any parental rights of Rosemary to these children.
Significantly, in this case, the lower court found "by clear and convincing evidence that [Rosemary and Hiram] have failed to substantially comply with the treatment plan and the terms of the post-adjudicatory period of improvement." Therefore, *756 the trial court rejected the Children's Case Plan. In this regard, this Court has held that,
[a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.
Syl. pt. 6, In the Interest of Carlita B., id. While all of the MDT personnel opined that Rosemary had made great strides in her improvement period, the lower court found that she had failed to comply with the period of improvement. The lower court acknowledged that Rosemary had performed better toward the end of the treatment period; however, the court found that a view of the overall treatment period showed that little progress had actually been made. The lower court emphasized Rosemary and Hiram's history of failing to follow through with services, the emotional abuse experienced by the children as a result of juvenile petitions filed by Rosemary against the children when they reach a certain age, and the family shunning that continued even in the midst of group therapy sessions. Further, while Rosemary appears to have attempted to eradicate the cockroach problem from her house, there was recent evidence of a problem with flea infestations, which resulted in multiple bites to one of the children during a visit. Significantly, as found by the lower court, Rosemary fails to appreciate the extent of the physical and emotional abuse suffered by the children as a result of the actions and inactions by both Rosemary and Hiram.
The children have been in their current placements since 2007. By all accounts from the DHHR and the two current guardians ad litem, these children are doing better in their current placements than they ever have done, and they regress after any contact with Rosemary and/or Hiram. Thus, the circuit court's determinations should be affirmed.

IV.

CONCLUSION
For the foregoing reasons, the July 3, 2008, Dispositional Hearing Order by the Circuit Court of Mineral County is hereby affirmed. The termination of Rosemary's parental rights to the children is affirmed, and the denial of post-dispositional visitation also is affirmed.[21]
Affirmed.
Chief Justice BENJAMIN and Justice WORKMAN concur and reserve the right to file concurring opinions.
WORKMAN, Justice, concurring:

(Filed Oct. 26, 2009)
The majority's decision is well-written and certainly reaches the right result for these children. Unfortunately, the years that the DHHR permitted these children to live in neglectful and abusive circumstances will likely have a negative impact for the rest of their lives.
Despite at least eleven referrals to the DHHR that began in 2001, it was not until June 12, 2007, that the DHHR filed an abuse and neglect petition against Rosemary and Hiram. The DHHR's 2007 petition did not occur until there were more than six years of very serious allegations of abuse and neglect, wherein children were removed from the home on four separate occasions beginning in 2003. Even then, as more fully discussed below, in its June 6, 2008, subsequent filing in the circuit court, prior to a June 19, 2008, dispositional hearing, and in spite of a mountain of disturbing evidence showing abuse and neglect toward these children, the DHHR recommended that these children be returned to Rosemary and Hiram. It is *757 outrageous that seven children were left in despicable circumstances by the DHHR for more than six years and even then, that the DHHR still sought to place those children back in an unsafe environment.
It is important to review some of the underlying facts. As early as March 22, 2001, allegations arose that Rosemary did not have the proper medication for Brandon and, instead, was replacing it with sleeping medication. Again, on August 21, 2001, the DHHR was informed that Brandon's medication was not being filled and that it was interfering with his schoolwork. Next, on August 14, 2002, the DHHR received a referral alleging that another child, Kenny, was being emotionally abused. With regard to the allegations concerning Kenny, even though the DHHR substantiated those charges of abuse, a case was not opened and the DHHR did not pursue an abuse and neglect petition. Instead, the DHHR referred Rosemary and Hiram to Family Preservation for parenting skills.
Soon thereafter, on August 27, 2002, the DHHR received a referral alleging that there was an immediate risk to the safety of Brittany, due to a discovery that she was having suicidal thoughts and had run away from home. On that same day, the DHHR received another referral alleging physical abuse, questionable disciplinary techniques, inadequate housing, and unrealistic expectations. Just a few weeks later, on September 5, 2002, the DHHR substantiated allegations that Rosemary hit the children with cake turners, withheld food as punishment, and mentally abused the children by threatening to send them back to Baltimore, Maryland, if they were bad. In this instance, sending the children back to Baltimore meant giving six children back to their biological parents, who were described by the circuit court as current and "long-time Baltimore drug addicts."
As evidence of abuse and neglect against Rosemary and Hiram continued to accumulate, on January 29, 2003, Brittany was removed from Rosemary's home on a juvenile petition, and returned to the home on February 26, 2003. She was again removed from Rosemary's home on September 9, 2004, and remains in the custody of the DHHR. On March 11, 2004, Kenny was removed from Rosemary's home by a juvenile petition, and was returned to the home on June 24, 2005. On September 9, 2004, the DHHR received yet another referral alleging inadequate care and emotional abuse in Rosemary's home, while on September 6, 2005, the DHHR received a referral alleging that Rosemary was refusing to send Joshua to school. On December 18, 2006, the DHHR received a referral alleging that Hiram physically and mentally abused Kenny. Kenny was temporarily removed from the home due to a juvenile petition, and the DHHR substantiated the allegations of emotional abuse. Even after all of these events, the DHHR still failed to institute a petition for abuse and neglect at this point.
On January 5, 2007, another child, Brandon, was removed from Rosemary's home and placed with the Division of Juvenile Services. On May 16, 2007, the DHHR received yet another referral, this time alleging that physical and emotional abuse was occurring in Rosemary's home. The children disclosed to DHHR employees that Hiram's sister, Serephine, her son Travis, and Travis' girlfriend, Diane, had been living at Rosemary's home, and that Hiram, Travis, and Diane had all overdosed at the home on numerous occasions. The children reported that Rosemary would give Hiram, Travis, and Diane milk when they passed out, and would only call an ambulance if she could not awaken them. The children alleged that Serephine's children were all taken away due to her crack addiction, and that Serephine was incredibly mean to them calling them names like "slut" and "whore." During the investigation for this referral, another child, Tiffany, was discovered with self-inflicted cut marks on her arms. Despite the fact that the DHHR substantiated emotional abuse and drug abuse in the home, and even witnessed emotional and physical harm to a child, it did not file a petition for abuse and neglect until June 12, 2007.
In its June 12, 2007, petition, the DHHR stated that "the [DHHR] has recently learned that Hiram is a convicted felon" and had been found guilty of drug possession and illegal transportation of firearms. It further *758 pointed out that Hiram's sister, Serephine, was awaiting trial on charges of driving while under the influence of drugs, and that she had a criminal background of larceny, stalking, domestic violence, obstruction, and telephone misuse. It was also reported that Serephine's son Travis, who was now living in Rosemary's home, had a criminal background consisting of arson, theft, destruction of property, obstruction, harm and injury, assault, verbal threats, and conspiracy.
The DHHR contended that remaining in the home would "further endanger the children" and that "[t]he parents have failed to benefit from previous intervention and services and the same dangerous behaviors continue to exist in the home." Thus, the DHHR stated that it "fears for their safety" and that there was "no alternative but the removal of the children from the home." Notwithstanding its earlier position, however, during a June 6, 2008, hearing before the circuit court, the DHHR had the audacity to recommend that four of the children be reunified with Rosemary and Hiram. It further recommended that a fifth child remain in the foster care system and become a ward of the state. It is important to explain that the only reason the DHHR did not recommend that the fifth child be returned to Rosemary, is that Rosemary and Hiram no longer wanted that child. Moreover, at the time of the DHHR's petition, the remaining two children had turned eighteen and were no longer under the circuit court's jurisdiction. Given the overwhelming evidence below, it is inconceivable that the DHHR could take a position that would have placed these children back in Rosemary's home.
In spite of the DHHR's misguided posture on placement of the children, following a June 19, 2008, dispositional hearing, the circuit court wisely disagreed with the DHHR and terminated Rosemary and Hiram's parental rights. The circuit court noted that this was one of the "most unusual procedural situations of any abuse and neglect case this judge has encountered in ten years on the bench." He pointed out that Rosemary, who was seventy-five-years-old at the time of her dispositional hearing, and her forty-seven-year-old son, Hiram, were never approved as a foster home in Maryland or West Virginia; yet, they had seven children living in their home who were instructed to call them "Mom and Dad," none of whom were related by either blood or marriage to Rosemary or Hiram. The circuit court states that there was never even a child protective service case regarding these children in Maryland, and that "[t]he various cases seemed to be handled in family court, if at all." Incredibly, the biological parents' rights to six of the children were not even terminated until December 12, 2007, while the biological mother's rights to the seventh child are still pending in the lower court. These children were ages two to twelve when they came to West Virginia, but were ages nine to nineteen at the time of the first dispositional hearing in the circuit court. Even then, as previously discussed, the DHHR was willing to leave these children in the care of Rosemary and Hiram. Why were these children failed by West Virginia and Maryland year after year?
There were countless red flags that should have triggered swift and meaningful action by the DHHR toward these children as numerous acts of abuse and unhealthy living conditions in Rosemary's home were substantiated throughout the years. As the circuit court stated, "A deplorable pattern was revealed." The circuit court further explained that "[a]s soon as a child gets old enough to report abuse, Rosemary would file a juvenile petition to get rid of and punish the child. That child is then shunned by Rosemary and Hiram." Clearly, these children lived in deplorable physical and emotional circumstances. Nonetheless, even though it was reported that a goat and a lamb were living inside the house, and that the house had a significant cockroach and flea infestation problem, in addition to the myriad reports of emotional and physical abuse, the DHHR found no reason to take action during those time periods.
Rosemary and Hiram's treatment of Patricia is also troubling. As the circuit court explained, "One of the best examples of how the DHHR, Guardian ad Litem and other MDT [Multidisciplinary team] members have overlooked the obvious is the cruel and completely *759 unnecessary treatment of Patricia because she has Hepatitis C." It is believed that Patricia contracted Hepatitis C as an infant when her biological mother stabbed her with a dirty needle used for drug abuse. Throughout her time in Rosemary's home, Patricia was not allowed to use the family bathroom and was forced to use a bucket for a toilet that was located in a trailer outside of the home and without working plumbing. As the circuit court explained, "she was ostracized from the family at mealtime and in other ways [and she] was told she would die before she was sixteen." Rosemary and Hiram treated Patricia in this despicable manner in spite of well-documented evidence in the record that they had received specific and detailed medical advice to the contrary from numerous individuals. Earlier involvement by the DHHR could have prevented this situation altogether.
It is frustrating that it was not until this appeal, and after the circuit court terminated the parental rights of Rosemary and Hiram in 2008, that the DHHR finally took the position that the children remain in their current placements and that visitation with Rosemary occur only at the discretion of the individual children. The DHHR is about eight years late. Where was the DHHR as continued abuse and neglect occurred with child after child, year after year?
In consideration of all of the above, as well as the countless other cases throughout the years regarding the DHHR's responsibilities toward the children of this State, we face an epidemic in child protective services in West Virginia that will necessarily affect future generations as they almost always re-appear within the court system battered, bruised, and often broken; or as abusers in their adult families; and often as criminals. It is clear that most child protective service workers in West Virginia are dedicated and conscientious, but also overworked, and underpaid. This concurring opinion is in no way intended to denigrate their work. Instead, the intent is to issue a clarion call to the DHHR to provide child protective services with more resources and more direction in protecting children as provided in an extensive body of both statutory and case law.
It is also important to note that from the earliest time these children came to the DHHR's attention, some inquiry should have been made as to their legal status. The record reflects that Rosemary and Hiram had only a legal guardianship of the children executed by the children's biological parents and endorsed by a Maryland court. Once these children fell in West Virginia's jurisdiction by virtue of the earliest abuse and neglect allegations, the DHHR should have begun an ongoing inquiry into the legal status of the children. Case law has made clear that every child is entitled to permanency to the greatest extent the legal system can ensure it. See State ex rel. Amy M. v. Kaufman, 196 W.Va. 251, 470 S.E.2d 205 (1996); In re Jonathan G., 198 W.Va. 716, 482 S.E.2d 893 (1996); In re Brian D., 194 W.Va. 623, 461 S.E.2d 129 (1995); In re Lindsey C., 196 W.Va. 395, 473 S.E.2d 110 (1995) (Workman, J., dissenting); In re Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991). The DHHR should have acted very early to begin concurrent planning,[1] more effective intervention, and permanency in the children's livespermanency in "the level of custody, care, commitment, nurturing and discipline that is consistent with ... [a] child's best interests." State v. Michael M., 202 W.Va. 350, 358, 504 S.E.2d 177, 185 (1998). This Court observed in Amy M., supra, that a child deserves "resolution and permanency" in his or her life and deserves the right to rely on his or her caretakers "to be there to provide the basic nurturance of life." 196 W.Va. at 260, 470 S.E.2d at 214. Moreover, "the best interests of the child is the polar star by which decisions must be made which affect children." Michael K.T. v. Tina L.T., 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted).
*760 This Court has consistently held that abuse and neglect cases must be given the highest priority to ensure their prompt resolution in order to provide permanency for the children involved therein. See Syllabus Point 1, In re Carlita B., supra. It is a child's natural right to have proper care, adequate nutrition, shelter, and nurturance; and to not be neglected, abused, or forced to live in a substandard, scarring environment. But in too many cases in this Court, we see children who are denied permanency by being left in legal limbo for long periods of time during their formative years. This phenomenon not only causes concern that this may be the tip of the iceberg, but engenders the question as to whether we must begin to reexamine child protective services in a more systemic manner.
Therefore, for the reasons set forth above, I respectfully concur with the majority opinion.
BENJAMIN, Chief Justice, concurring:

(Filed Dec. 22, 2009)
I concur completely in the majority per curiam opinion of the Court. The July 3, 2008 Dispositional Hearing Order of the circuit court and the termination of rights and denial of post-dispositional visitation was proper. As I wrote earlier this year in my concurrence to the Court's decision in State ex rel. WVDHHR v. Pancake, 224 W.Va. 224 W.Va. 39, 680 S.E.2d 54 (2009) (C.J. Benjamin, concurring): "Our guiding principle in cases such as this is the health and welfare of the child. These cases deservedly receive the highest priority of the court system's attentiona priority which applies to government in general. In re Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991)."
I write separately to express my continuing frustration with the failures of the Department of Health and Human Resources ("DHHR") to comply in a timely manner with its legal mandate to help families and children in West Virginia. My concerns are shared by Justice Workman and, I believe, by others on this Court.[1] The harsh emotional tone adopted by Justice Workman in her concurrence, I believe, richly conveys the general frustration of many with DHHR's inability to meet its legal mandatean inability which, I believe, will necessarily require this Court to resolve the issue if nothing is done.
In view of the continuing inability of the DHHR to meet its legal mandate to the children and families of West Virginia, I believe that this Court must soon consider the creation of a commission to ensure that all legal mandates are adequately met by the DHHR.
NOTES
[1] "We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M., 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987) (citations omitted).
[2] On appeal to this Court, only three children are at issue: Patricia, Joshua, and Brandon. Two siblings, Kenneth and Brittany, born 1989 and 1990, respectively, reached the age of majority during the earlier proceedings and are no longer part of these proceedings. This Court recognizes that Tiffany also reached the age of majority in September 2009, and thus, is no longer under this Court's jurisdiction in this matter. Further, Rosemary did not appeal the denial of her parental rights and/or visitation with regard to Tessa. Thus, this Court will decide the issues only as they relate to the remaining three children.
[3] Specifically, Rosemary argues that the lower court erred by improperly obtaining testimony from the children involved; considering the relative wealth or poverty of her situation in deciding whether to terminate parental rights; issuing its dispositional order in violation of the applicable time periods; and failing to appoint counsel for her son, Hiram C. (hereinafter "Hiram"), even after it was apparent that his actions or inactions could directly affect Rosemary's improvement period.
[4] While Rosemary is the only petitioner whose rights are before this Court, the record reveals that the children referred to Rosemary as "mom" and to Hiram as "dad." It is undisputed that Hiram was a caretaker of the children during the time that they were in Rosemary's home. Moreover, some of the allegations in the abuse and neglect petition were directed to Hiram's conduct. Hiram's actions were an issue in the case plan, and he was subjected to court-mandated counseling and services. Further, the circuit court's dispositional order found that "[Hiram] has been treated as a party in this case ... and signed the treatment plan." Significantly, the lower court ordered as follows: "That any parental rights, including visitation of Rosemary ... and Hiram ... to Tiffany ... Patricia ... Joshua... Brandon ... and Tessa ... are hereby TERMINATED." During an April 16, 2008, status hearing in the underlying case, Rosemary's counsel made a motion for Hiram to receive court-appointed counsel. Hiram indicated to the lower court that he was willing to proceed in the matter without representation of counsel; however, it does not appear that he was ever designated as a party in this action.
[5] All of the children in Rosemary's care had the same biological parents with the exception of Tessa.
[6] It is believed that Patricia contracted this disease as an infant when her biological mother stabbed her with a dirty needle used for drug abuse. This incident occurred prior to the time when Patricia came to be in Rosemary's care.
[7] Hiram has a felony record with convictions for drug possession and transportation of firearms. At one time, at least two other adults, Rosemary's daughter and grandson, lived in the home. The daughter was awaiting trial on charges related to driving under the influence. Her criminal background also included larceny, stalking, obstruction, and telephone misuse. The grandson's criminal background included charges of arson, theft, destruction of property, obstruction, harm and injury, assault, verbal threats, and conspiracy.

Since the institution of the underlying proceedings, the daughter and grandson have left the home and have not returned. The children have reported various instances of Hiram and other adults acting strangely and in ways that the children believed illustrated drug use.
[8] The CPS referrals began in 2001. While we recognize that not every referral was substantiated and that there was also the issue of continuing jurisdiction in the Maryland courts, it seems that the delay in bringing the abuse and neglect petition was extensive and only served to prolong the children's exposure to an unstable home. See Syl. pt. 1, in part, and Syl. pt. 5, In the Interest of Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991) ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security.") ("The clear import of the statute [West Virginia Code § 49-6-2(d)] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible."). The delays do not appear to be a result of the circuit court or its docket, but rather, a delay in filing the petition at the outset. However, the record is unclear as to any discernible reason for the delay.
[9] All of the children in Rosemary's care had the same biological parents with the exception of Tessa. Rosemary's rights with regard to Tessa are not at issue before this Court as neither person desires interaction with the other person, and Rosemary did not appeal the termination of her parental rights and denial of visitation with Tessa.
[10] Termination of the biological parents' rights is not at issue in this appeal.
[11] As of the time of oral argument, Tiffany, Patricia, and Joshua were placed in foster care. Patricia and Joshua are together in the same placement. Tiffany reached the age of majority in September 2009. Brandon was removed from the home in January 2007 as a result of a juvenile and/or status offense petition. He was ultimately placed in a residential treatment facility and remains in that placement at this time. His eventual placement is undetermined.
[12] The children reported various instances of adults being passed out and Rosemary pouring "milk" down their throats to wake them. Additionally, there were two instances when some of the children thought someone had "died" after he or she passed out and emergency services were called.
[13] See note 4, supra.
[14] W. Va.Code § 49-5D-3a (2004) (Repl. Vol. 2004), in relevant part, provides:

(a) In any case in which a multidisciplinary treatment team develops an individualized service plan for a child pursuant to the provisions of section three [§ 49-5D-3] of this article, the court shall review the proposed service plan to determine if implementation of the plan is in the child's best interests. If the multidisciplinary team cannot agree on a plan or if the court determines not to adopt the team's recommendations, it shall, upon motion or sua sponte, schedule and hold within ten days of such determination, and prior to the entry of an order placing the child in the custody of the department or in an out-of-home setting, a hearing to consider evidence from the team as to its rationale for the proposed service plan. If, after a hearing held pursuant to the provisions of this section, the court does not adopt the team's recommended service plan, it shall make specific written findings as to why the team's recommended service plan was not adopted.
[15] Rosemary reports her income from social security as $793.00 per month. Hiram reports that he has applied for social security disability for depression, nervousness, and a heart valve problem. He occasionally performs odd jobs, which can total $400.00 to $500.00 per month in income, but there is no record evidence demonstrating the continuity of this income.
[16] The original guardian ad litem in the case submitted a letter for this Court's use in this appeal. In that letter, the guardian opined that reunification was the most reasonable recommendation at the time of the dispositional hearing. However, due to the passage of time and the children's successful placements, he now recommends that the parental rights of Rosemary be terminated, but that visitation be allowed.
[17] The relevant portion of Rule 8 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides as follows:

(b) Procedure for taking testimony from children.The presiding judicial officer may conduct in camera interviews of a minor child, outside the presence of the parent(s). The parties' attorneys shall be allowed to attend such interviews, except when the presiding judicial officer determines that the presence of attorneys will be especially intimidating to the child witness. When attorneys are not allowed to be present for in camera interviews of a child, the presiding judicial officer shall, unless otherwise agreed by the parties, have the interview electronically or stenographically recorded and make the recording available to the attorneys before the evidentiary hearing resumes. Under exceptional circumstances, the presiding judicial officer may elect not to make the recording available to the attorneys but must place the basis for a finding of exceptional circumstances on the record.... This Court recognizes that the lower court met with the children individually on June 12, 2008, as stated in the trial court's Dispositional Hearing Order. There is no indication that the guardian ad litem was present, that notice was presented to any parties, or that a record was made of the interviews. While we find the procedure utilized by the lower court was error, we are satisfied that such error was harmless. See Syl. pt. 3, in part, Original Glorious Church of God In Christ, Inc. of Apostolic Faith v. Myers, 179 W.Va. 255, 367 S.E.2d 30 (1988) (per curiam) ("`[T]his Court will disregard and regard as harmless any error, defect or irregularity in the proceedings in the trial court which does not affect the substantial rights of the parties.' Syl. pt. 2, Boggs v. Settle, 150 W.Va. 330, 145 S.E.2d 446 (1965)."). Notwithstanding any information learned by the circuit court during these interviews with the children, the record is replete with evidence properly relied on by the circuit court as a foundation for its underlying decisions.
[18] In this Court's previous case of State ex rel. West Virginia Department of Human Services v. Cheryl M., 177 W.Va. 688, 695-96, 356 S.E.2d 181, 188-89 (1987), we recognized "the existence of a bias in favor of having the child with someone who is more economically secure[.]" In addressing this matter, we stated that

[p]etitions for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria.
Id. (internal citations omitted). We find that a fair reading of the lower court's order reveals that Rosemary's modest economic status was not the basis for any termination decisions. Rather, one of the concerns enumerated by the circuit court was the apparent lack of evidence that would illustrate that these two people could adequately feed and clothe these children. This fear was further bolstered by the reports in the record that the children, upon being placed in foster care outside of Rosemary's home, were amazed to find food in the refrigerator. Moreover, the foster parents indicated that some of the children displayed hoarding tendencies with their food as if they were afraid that more food would not be available in the future. Thus, we find Rosemary's argument wholly without merit.
[19] The relevant portion of Rule 36 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides that "[t]he court shall enter a disposition order, including findings of fact and conclusions of law, within ten (10) days of the conclusion of the [dispositional] hearing." In the present case, the dispositional hearing took place on June 19, 2008; and the order was entered July 3, 2008. In the absence of any time computation specified in the Rules of Procedure for Child Abuse and Neglect Proceedings, this Court resorts to Rule 6 of the West Virginia Rules of Civil Procedure for time computation, which provides as follows:

In computing any period of time prescribed or allowed by these rules, by the local rules of any court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included.... When the period of time prescribed or allowed is fewer than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.
Following the time computation rules, the order was properly entered on the tenth day following the dispositional hearing.
[20] We find this argument to be without merit. Rosemary is the only party who had received guardianship rights from the Maryland courts. See note 4, supra. See also Syl. pt. 1, Maples v. West Virginia Dep't of Commerce, 197 W.Va. 318, 475 S.E.2d 410 (1996) ("A litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal."). See also Hardy v. Hardy, 197 W.Va. 243, 250, 475 S.E.2d 335, 342 (1996) (per curiam) ("[t]he need for judicial economy within the family law master system precludes allowing everyone multiple opportunities for factual development, especially for the party who invited the error." (internal citations omitted)). Thus, we deem this issue waived by Hiram and not properly raised by Rosemary. See Snyder v. Callaghan, 168 W.Va. 265, 279, 284 S.E.2d 241, 250 (1981) ("Traditionally, courts have been reluctant to allow persons to claim standing to vindicate the rights of a third party on the grounds that third parties are generally the most effective advocates of their own rights and that such litigation will result in an unnecessary adjudication of rights which the holder either does not wish to assert or will be able to enjoy regardless of the outcome of the case." (internal citations omitted)).
[21] Further, the lower court's determination ordering "significant visitation among the children" is recognized and affirmed. See Syl. pt. 9, In the Interest of Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991) ("`In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.' Syl. Pt. 4, In re James M., 185 W.Va. 648, 408 S.E.2d 400 (1991).").
[1] See In re Micah Alyn R., 202 W.Va. 400, 409, 504 S.E.2d 635, 644 (1998) (Workman, J., concurring) ("concurrent planning for permanency should occur even where parental rights are not terminated. This should be the practice in all abuse and neglect cases, so that there is a permanency plan for children where family reconciliation efforts are not successful for whatever reason").
[1] See, for example, Justice Workman's concurrence herein. Because I believe that Justice Workman's concurrence focuses too much on the employees and administrators of DHHR, rather than on more institutionalized systemic problems such as inadequate resources, I choose not to join her separate opinion. From my observation, the employees and administrators of DHHR not only have the desire to serve the families and children of West Virginia, but also do so to the best of their abilities. Theirs is a thankless task which is easy to criticize and which too frequently goes unnoticed and unrecognized for the good actually done. I likewise choose not to join in the raw emotionalism apparent in Justice Workman's concurrence. "[T]he effective judge ... strives to persuade, and not to pontificate." Hon. Ruth Bader Ginsburg, Speaking in a Judicial Voice, 67 N.Y.U. L. Rev. 1185, 1186 (1992). A judge should speak in "a moderate and restrained" voice. Id. A separate opinion should never "generate more heat than light." Id., at 1194. While I choose not to join her separate opinion, it is apparent that Justice Workman not only shares my frustrations, but that her patience is close to being exhausted, if it isn't already exhausted.