772 S.E.2d 914

**In re K.P., I.C., G.C., and I.C.**

No. 14–0895.

Supreme Court of Appeals of
West Virginia.

Submitted March 11, 2015.

Decided May 15, 2015.

Patrick Morrisey, Esq., Attorney General, Charleston, WV, Katherine M. Bond, Esq., Assistant Attorney General, White Hall, WV,

for Petitioner West Virginia Department of Health and Human Resources.

Rebecca Tate, Esq., Fairmont, WV, Petitioner and Guardian ad Litem for infant children.

Scott A. Shough, Esq., Fairmont, WV, for Respondent R.C.

Mikal–Ellen Bennett, Esq., Weston, WV, for Respondent A.C.

LOUGHRY, Justice:

The joint petitioners, the West Virginia Department of Health and Human Resources ("DHHR") and Rebecca Tate, guardian ad litem ("GAL") for all of the minor children in this abuse and neglect case, appeal the "Amended Final Adjudication Order Dismissing Petitions" entered by the Circuit Court of Marion County on September 3, 2014. The circuit court dismissed an abuse and neglect petition that was filed against the respondents herein, R.C. and A.C.,[1] upon concluding that the DHHR failed to prove the allegations in the petition by the requisite standard of clear and convincing evidence. Based upon this Court's thorough review and consideration of the appendix record, arguments of counsel, and applicable precedent, we reverse the circuit court's order and remand this case for further proceedings consistent with this opinion.

### I. Factual and Procedural Background

On July 1, 2013, K.P., a thirteen-year-old girl, disclosed that her stepfather, the respondent R.C., had engaged in sexual misconduct against her. Following an investigation, the DHHR filed a petition in the circuit court initiating the underlying abuse and neglect case pursuant to the provisions of West Virginia Code §§ 49–6–1 to –12 (2014).[2] The DHHR removed all of the children from the home.[3] The initial petition filed in this matter alleged that R.C. sexually abused K.P., and that K.P.'s mother, the respondent A.C., failed to protect K.P. from the abusing parent. Subsequently, after additional information was obtained, the DHHR amended its petition to add allegations that A.C. committed acts of emotional abuse against K.P.

In multiple interviews conducted for purposes of this abuse and neglect proceeding, K.P. consistently made the following assertions.[4] On the morning of July 1, 2013, she was texting from her cellular telephone while lying on her bed in the home she shared with her mother, stepfather, and other family members. Her mother was not home. At approximately 10:00 a.m., her stepfather R.C. entered her bedroom and began rubbing her back both over and under her shirt. When she rolled over, he rubbed her stomach, lifted her shirt, and rubbed her breasts. She was not wearing a bra. R.C. also rubbed K.P.'s vaginal area over her clothes, going back and

1. Because this case involves children and sensitive matters, we follow our practice of using initials to refer to the children and their parents. *See* W.Va. R.App. P. 40(e); *State v. Edward Charles L.*, 183 W.Va. 641, 645 n. 1, 398 S.E.2d 123, 127 n. 1 (1990). Two of the minor children who have the same initials are referred to herein as I.C.–1 and I.C.–2.

2. During the 2015 Regular Session, the West Virginia Legislature repealed West Virginia Code §§ 49–1–1 through 49–11–10 and recodified these statutes, with some revisions, into West Virginia Code §§ 49–1–101 through 49–7–304. The references in this opinion are to the statutes as they existed during the pendency of the proceedings below.

3. On July 1, 2013, K.P. lived in the home of her mother and stepfather, A.C. and R.C. Other children in the home were four-year-old I.C.–1, who is the daughter of R.C. and A.C.; and ten-year-old I.C.–2 and fourteen-year-old G.C., who are R.C.'s children from a prior relationship. K.P. was placed with her biological father; I.C.–1 was placed with an aunt; and I.C.–2 and G.C. were placed with their biological mother with whom they resided during the school year.

4. Regarding her allegations of abuse, K.P. was interviewed by Detective Jeanette Williamson of the Marion County Sheriff's Department, Child Protective Services Worker Stacy Miller, Psychologist Dr. Adrienne A. Bean, and, upon the respondents' motion, Psychiatrist Dr. Bobby A. Miller. All four of the interviewers testified at the adjudicatory hearing, and video recordings of the interviews conducted by Ms. Miller and Dr. Miller are in the appendix record. Finding that the information K.P. gave in each of the interviews was "consistent with no discrepancies," and that forcing the child to testify in court could be detrimental to her psychological well-being, the circuit court quashed a subpoena that would have required K.P. to testify. Accordingly, for purposes of adjudication, the circuit court relied upon K.P.'s statements made in the interviews.

forth between rubbing her vaginal area and breasts. He then asked if he could lick her breasts, to which K.P. responded "no." K.P. asked him to leave the bedroom, but he remained for approximately thirty minutes longer and rubbed her back. K.P. communicated via text messages with a friend who told her to lock herself in a room and telephone her parents for help.[5] After R.C. left the bedroom, K.P. tried to call her mother, her biological father R.P., and R.P.'s wife A.P. She was able to reach A.P., who agreed to immediately come and remove K.P. from the house. As K.P. was packing some personal belongings and waiting for her stepmother, R.C. returned to her bedroom, begged her not to tell anyone what had happened, and offered to buy her whatever she wanted if she kept the events secret. He followed K.P. into the kitchen, making the same pleas. He said that she would ruin his life, he would go to jail, and he would be unable to see his other kids. When K.P. told him that A.P. was on the way, R.C. said that he needed to get out of there because he was going to jail.

K.P. also revealed that R.C. had touched her in this manner on multiple occasions throughout the previous year.[6] She indicated that in the initial occurrences, he had just rubbed her back and she had not realized that the touching was sexual. In later episodes, R.C. rubbed additional areas of her body including her breasts, her buttocks, and her vaginal area both over and under her clothes but without penetration. She reported that this misconduct occurred both at home and when she traveled with her stepfather for his work. K.P. explained that she had not previously disclosed her stepfather's actions because she was "creeped out" and did not know what to do. She felt that her mother would not believe her and would take her stepfather's side. She also had some fear that her stepfather might hurt her.[7] K.P. explained that the episode on July 1,

2013, was the first time R.C. had ever asked to lick her breasts, and she worried that this request could lead to sexual intercourse. K.P. indicated that it was the request to lick her breasts that convinced her of the need to tell someone.

The stepmother, A.P., testified that when K.P. called her on July 1, 2013, K.P. was crying and unable to speak about what had happened. K.P. agreed to explain the problem in a text message. A.P. testified that after reading the text message, she told K.P. to pack a bag because she would immediately leave work and pick K.P. up. A.P. testified that when she arrived at the home, which was about a one-hour drive from her workplace, K.P. was outside and hiding behind a neighbor's house. A.P. observed that K.P. had been crying, had a shaky voice, and was upset.

A.P. drove K.P. to a nearby gas station where she had arranged to meet K.P.'s father, R.P. Meanwhile, the respondent mother A.C., having received calls on her cellular telephone from both R.P. and the respondent R.C., also arrived at the gas station. A.C. brought K.P. into her parked car and began questioning K.P. while recording the conversation on her telephone. The recording was later played for the investigating sheriff's deputy and a child protective services ("CPS") worker, but was not offered into evidence at the abuse and neglect adjudicatory hearing. Reportedly, during this conversation A.C. told her daughter that she was going to ruin R.C.'s life, that A.C. herself had been sexually abused, and that sexual abuse "is something you just live with in shame." K.P. says that A.C. also "fake cried" and expressed concern that the allegations could hurt A.C.'s job. A.P. testified that when K.P. got out of the parked car, K.P. was upset that her mother did not believe her.

After K.P.'s father, R.P., arrived at the gas station, they all proceeded to the Marion

---

5. No text messages were offered into evidence in the adjudicatory hearing. However, A.C. testified that she saw these texts on K.P.'s telephone.

6. K.P. gave consistent reports about what her stepfather did to her in the prior incidents. However, as discussed below, the circuit court

found that K.P. gave varying accounts regarding the frequency of the prior abuse.

7. Both K.P. and I.C.–2 revealed in their respective interviews that R.C. had hit A.C. in the past. However, A.C. testified that R.C. had never hit her.

County Sheriff's Department to file a report. Sheriff's Deputy, now Sheriff's Detective, Jeanette Williamson conducted an initial interview of K.P. At Detective Williamson's request, R.C. was telephoned and came to the police station. However, he refused to speak with police without a lawyer. Detective Williamson referred the matter to CPS for a further interview of the child.

A CPS worker, Stacy Miller, interviewed K.P. the next day, July 2, 2013. During the adjudicatory hearing Ms. Miller testified about this interview, including K.P.'s description of the sexual abuse and A.C.'s reaction to her daughter's report. Ms. Miller also testified that she observed K.P. lose eye contact and shy away when telling about R.C.'s request to lick her breasts. Ms. Miller did not perceive that K.P. was exaggerating her allegations. Detective Williamson testified that K.P.'s disclosures to Ms. Miller, which were videotaped and which Detective Williamson observed from another room, had no major differences or elaborations from the initial report.

During the course of the abuse and neglect investigation, K.P. underwent an interview and diagnostic testing by psychologist Dr. Adrienne A. Bean. Dr. Bean testified at the adjudicatory hearing and recounted K.P.'s allegations of sexual abuse. Dr. Bean also provided information that K.P. revealed about her mother, including that A.C. obsessed about K.P.'s weight and placed limits on the food K.P. could have. K.P. said that while she and her parents were at the gas station and she was reporting the sexual abuse, A.C. was more concerned that K.P. had eaten macaroni and cheese that morning. K.P. also told Dr. Bean that A.C. hit her, called her vulgar names such as "f* * *ing fat a* * *" and "c* * *sucker," and told K.P. that she would rather be dead than have K.P. as a daughter.

Dr. Bean reported that the test results showed K.P. to be slightly defensive, but there was nothing to indicate she is untrustworthy, deceitful, or has delinquency issues. The psychologist found K.P. to be very insightful and mature with good self esteem. Dr. Bean also felt that K.P. was being open and honest about the things she had been through, and found she was consistent in describing the alleged abuse. K.P. was not exhibiting any mental health or social-emotional symptoms, but Dr. Bean explained that not all child victims exhibit such symptoms and these issues may develop later. Dr. Bean concluded that K.P. is resilient and has been able to cope using her current skills.

R.P. testified that on July 1, 2013, he spoke with his wife on the telephone and learned of the allegations. He immediately called the respondent A.C. According to R.P., even though A.C. had not yet talked to their daughter, A.C. disputed that any sexual abuse had occurred. Rather, A.C. suggested that R.C. had merely rubbed the child's shoulders. A.C. arrived at the gas station before R.P. did. R.P. recalled that when he arrived, instead of focusing on the report of molestation, A.C. was more concerned that K.P. had been talking to a boy online and had eaten macaroni and cheese. R.P. testified that after K.P. told him about her stepfather's actions, he made the decision that they would immediately go to the sheriff's office to make a report. He said that his daughter is well-behaved and truthful with him.

R.P. also testified that he had witnessed A.C. engage in inappropriate parenting in the past, including calling K.P. derogatory names and obsessing about their daughter's diet. Both R.P. and A.P. testified about a bruise they saw on K.P.'s foot, which K.P. said was inflicted by A.C. Furthermore, A.C.'s sister testified that she saw A.C. smack K.P. in the mouth a few times when the child was younger.

The respondent stepfather, R.C., who was also facing criminal charges for the alleged sexual conduct against K.P., did not testify in the abuse and neglect adjudicatory hearing. However, his lawyer presented the testimony and report of psychologist Dr. William Fremouw, who had administered diagnostic tests to R.C. According to Dr. Fremouw, the test results indicate that R.C. lacks the two most common characteristics of convicted sex offenders: an antisocial-psychopathic personality combined with the presence of cognitive schemas or attitudes that justify adult-child or adult forced sexual interactions. None-

theless, Dr. Fremouw made clear that his evaluation could not prove whether R.C. did, or did not, commit the alleged abuse.

The respondent mother, A.C., did testify at the adjudicatory hearing. She denied abusing K.P., denied calling K.P. vulgar names or calling her fat, and asserted she only restricted unhealthy food from K.P.'s diet. She denied engaging in any physical abuse, stating she had only spanked K.P. when the child was younger. A.C. admitted, however, that two or three months before these allegations, she had "smacked" K.P. in the mouth after repeatedly telling her to "shut up." A.C. indicated that K.P. has behavioral issues, lies, and is difficult to parent. A.C. testified that on July 1, 2013, her husband called her at work to say that K.P. was alleging inappropriate touching. Although she did not yet know any specific information about the allegations, A.C. immediately thought that R.C. had just rubbed the girl's back, something she had seen him do in the past. At the adjudicatory hearing, A.C. acknowledged that she does not believe her daughter's allegations of sexual abuse, finding the allegations to be unlikely and illogical. She testified that she knew K.P. was lying on July 1, 2013, by the look on her daughter's face.

A.C. asserted that K.P. was upset over the recent death of K.P.'s maternal grandmother, who was K.P.'s primary caretaker for many years. A.C. related that she and K.P. often argued, and K.P. did not like that she placed limits on junk food and access to electronic devices. According to A.C., K.P. fabricated the abuse allegations because she wanted to move to her father's home. A.C. indicated that K.P. prefers her father, and her father imposes fewer restrictions.

Dr. Amy Wilson Strange performed a parental fitness evaluation on A.C. and testified on A.C.'s behalf. Dr. Strange concluded that A.C. possesses the qualities and abilities needed to appropriately parent her daughters and has a very low risk of maltreating her children or allowing another person to do so. However, Dr. Strange admitted that she knew little about the allegations in this case,

and all of her information came from interviewing and testing A.C.

Finally, upon the motion of the respondent parents, K.P. was interviewed and tested by psychiatrist Dr. Bobby A. Miller. Dr. Miller concluded that K.P. is an adolescent who believes she can manage herself better than the adults in her life; that her allegations are "very simple" and impossible to physically prove or disprove; that K.P.'s presentation was a reaction to her grandmother's death; and that this legal proceeding is actually about K.P.'s mother and K.P.'s desire to not live in her mother's home. Dr. Miller admitted, however, that K.P.'s allegations are consistent and there are no indications that she is untrustworthy.

After a multi-day adjudicatory hearing, the circuit court concluded that the DHHR had not met its burden of proving that K.P. was abused by either of the respondents.[8] The court also found that R.C.'s refusal to testify and rebut the abuse charges could not be used as evidence against him. Accordingly, the circuit court dismissed the abuse and neglect petition in an amended final order entered on September 3, 2014. It is from this order that the DHHR and GAL jointly appeal.[9]

## II. Standard of Review

For appeals of abuse and neglect orders, "we employ a compound standard of review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *In re Emily,* 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). These standards were announced in syllabus point one of *In re Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996):

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be

---

8. The circuit court's rationale is discussed below.

9. On September 17, 2014, this Court stayed the circuit court's order pending appeal.

set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

With these standards in mind, we turn to the parties' arguments.

## III. Discussion

### A. Respondent R.C.'s Silence

■ We begin our analysis with the issue of the respondent stepfather's refusal to testify at the abuse and neglect adjudicatory hearing. The DHHR and GAL argue that R.C.'s failure to respond to the evidence offered against him should be considered as affirmative evidence of his culpability. R.C. disagrees, arguing that the circuit court correctly ruled that a respondent parent's silence during the adjudicatory stage of an abuse and neglect proceeding is not evidence of misconduct.

This legal issue was squarely addressed in *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). In *Doris S.*, an adult referred to as David E. was living in the household of a child who died as a result of shaken baby syndrome. Although David E. was not the deceased child's parent and was not accused of inflicting the fatal injuries, an abuse and neglect petition was filed against him alleging that he knowingly allowed the abuse to occur. *See* W.Va.Code § 49–1–3(1)(A) (2014) (defining "abused child" to include one whose parent, guardian, or custodian knowingly allows another person to commit abuse in the home). David E. chose to remain silent in the abuse and neglect proceeding, thereby failing to take steps to identify the perpetrator who caused the child's death. Ultimately, we affirmed the circuit court's order terminating David E.'s parental rights to his own chil-

dren, recognizing that his actions in failing to identify the abuser created such a hostile and unsafe atmosphere that it effectively placed his children in jeopardy had they remained in his custody. *Doris S.*, 197 W.Va. at 499, 475 S.E.2d at 875.

■ With regard to David E.'s silence, we found "[t]here is no basis in law for requiring that a court be disallowed from considering a parent's or guardian's choice to remain silent as evidence of civil culpability." *Id.* at 497, 475 S.E.2d at 873. In reaching this conclusion, this Court reasoned as follows:

[A]s the United States Supreme Court stated in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), "the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*'" *Id.* at 318, 96 S.Ct. at 1558 (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev.1961)); *see* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 5–2(B)(1) (3rd ed.1994). Moreover, "aside from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred by the Due Process Clause." 425 U.S. at 319, 96 S.Ct. at 1558. "'Silence is often evidence of the most persuasive character.'" *Id.* (quoting *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923)).

*Doris S.*, 197 W.Va. at 498, 475 S.E.2d at 874 (footnote omitted). We also recognized the remedial, non-punitive, purpose of abuse and neglect proceedings and determined that the invocation of silence by a parent or guardian goes to the very heart of the issue of whether the situation is treatable. *Id.* Accordingly, we held the following:

Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her

during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

*Id.* at 492, 475 S.E.2d at 868, syl. pt. 2.

We acknowledged in *Doris S.* that a parent or guardian might decide to remain silent because he or she is also facing criminal charges. However, even if he or she makes that choice, the silence can nonetheless be considered in the abuse and neglect proceeding. The rights of the criminally accused are sufficiently protected by various statutory protections. *Id.* at 497–98 n. 22, 475 S.E.2d at 873–74 n. 22.[10]

The situation of a parent or guardian facing simultaneous criminal charges was discussed more fully in a subsequent abuse and neglect case, *In re Daniel D.,* 211 W.Va. 79, 562 S.E.2d 147 (2002). In *Daniel D.,* the circuit court adjudicated a father as abusive for engaging in sexual conduct against his daughter. The father had elected to remain silent in the abuse and neglect proceeding because of related criminal charges. He argued that he faced a "Hobson's Choice" in the abuse and neglect case because he could not satisfy a post-adjudication improvement period without obtaining sex offender treatment, but no provider would provide this treatment unless he admitted committing sexual abuse. *Id.* at 83–84, 562 S.E.2d at 151–52. The father contended he was being required to admit to criminal conduct in violation of his Fifth Amendment privilege against self-incrimination. *Id.* Unpersuaded by the father's arguments, we reaffirmed syllabus point two of *Doris S.* as being "soundly supported by the authorities and ... consistent with the policy of this State which encourages prompt hearing of abuse and neglect cases and a paramount concern for the best interests of the children involved in such proceedings." *Id.* at 87, 562 S.E.2d at 155. We reiterated that "[a]s applied to the issue of culpability, the rule simply confronts the accused parent with a choice: Assert the privilege against self-incrimination with the risk that silence will be considered in the civil proceeding as evidence of culpability, or waive the privilege and offer such evidence as the accused may alone possess to refute the charge of abuse and neglect." *Id.*[11]

Despite our clear holdings in *Doris S.* and *Daniel D.,* the circuit court in the case *sub judice* found that R.C.'s silence could *not* be considered as evidence that he sexually abused K.P. In the amended order dismissing the abuse and neglect petition, the circuit court attempted to distinguish our case law with the following analysis:

Neither *West Virginia Dept. of Health and Human Resources ex rel. Wright v. Doris S.* ... nor *In re Daniel D.* ... controls here. In both [*Doris S.*] and *Daniel D.,* the court held that a parent's or guardian's silence in the face of an affirmative remedial duty may be considered as substantive evidence in terminating parental rights. In [*Doris S.*], the parent's silence evinced his failure "to cooperate in the identification of the person responsible for the homicide" of his [sic] child.... Similarly, in *Daniel D.,* the parent's silence evinced a "failure to comply with an order to obtain meaningful therapy or rehabilitation" *after* the trial court had definitively found that the parent had in fact abused the child.... In neither case, however, was silence con-

---

10. The statutes cited in *Doris S.* as providing protections for a parent or guardian who is also charged criminally include West Virginia Code § 49–6–4(a) (1995), prohibiting evidence acquired as the result of a person's medical or mental examination from being used against that person in a subsequent criminal proceeding, and West Virginia Code § 57–2–3 (1966), providing that in a criminal prosecution other than for perjury or false swearing, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination. *See also In re Daniel D.,* 211 W.Va. 79, 562 S.E.2d 147 (2002) (discussing statutory protec-

tions accorded persons accused of both civil and criminal abuse and neglect).

11. This Court did afford the father in *Daniel D.* some relief by remanding the abuse and neglect case with directions that he could obtain a protective order to prevent his statements made during a court-ordered medical, psychological, or psychiatric examination from being used in the criminal case. *Id.* at 90–91, 562 S.E.2d at 158–59. This protective order was to effectuate the protections afforded by West Virginia Code §§ 49–6–4 and 57–2–3. *See supra* note 10.

sidered substantive evidence that criminal abuse *actually occurred.* In fact, in *Daniel D.,* the court acknowledged "a very fine, although very important, distinction between terminating parental rights based upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation.... The latter is constitutionally permissible; the former is not." 563 S.E.2d at 152–53 (quoting *In re Clifford M.* [6 Neb.App. 754], 577 N.W.2d 547 (Neb.1998)). Because [R.C.] is under no duty to comply with a remedial order or affirmative duty under law, this case falls on the other side of the "fine line" drawn in *Daniel D.*

The circuit court's analysis is plainly wrong and reflects a misunderstanding of the law. We expressly held in syllabus point two of *Doris S.,* as reiterated in *Daniel D.,* that a court may properly consider silence as affirmative evidence of *culpability* for civil abuse and neglect. Contrary to the circuit court's discussion, our holding was not dependent upon the existence of a remedial order or some affirmative duty that the parent or guardian may have in the abuse and neglect proceeding. Moreover, although the circuit court found that R.C. had a basis for remaining silent because he was also facing criminal charges, that was the precise issue in *Daniel D.,* wherein we reaffirmed our holding in *Doris S.*

The circuit court's reliance on the "fine line" discussed in the Nebraska case, *Clifford M.,* is similarly misplaced. In the *Daniel D.* opinion, we discussed *Clifford M.* and other out-of-state cases in the context of examining how various jurisdictions have reconciled competing interests when parents charged with abuse and neglect will not participate in therapy due to concerns about self-incrimination in related criminal cases. *Daniel D.,* 211 W.Va. at 84–86, 562 S.E.2d at 152–154. We proceeded to address that issue by holding that under our West Virginia statutory law, the parent or guardian in an abuse and neglect case is entitled to a protective order for statements given during a court-ordered examination. *Id.* at 90, 562 S.E.2d at 158 (stating that "[o]ur review of the statutes, corre-

sponding case law of this state, and authority from other jurisdictions compels our conclusion that West Virginia Code § 49–6–4 was intended to constitute a full and comprehensive prohibition against criminal utilization of information obtained through court-ordered psychological or psychiatric examination ... ordered in conjunction with abuse and neglect proceedings."). The discussion of *Clifford M.* in no way modified our holding in *Doris S.* that silence may be evidence of civil culpability. Indeed, after discussing *Clifford M.,* we emphasized that *Doris S.* remained viable law. *Daniel D.,* 211 W.Va. at 87, 562 S.E.2d at 155.

We also reject R.C.'s suggestion that culpability may not be deduced from silence during the adjudicatory phase of an abuse and neglect proceeding. He argues that the application of *Doris S.* and *Daniel D.* should be limited to the disposition phase. Presumably, this suggestion is based upon the fact that the father in *Daniel D.* had already been adjudicated as an abusing parent and was confronted with his so-called "Hobson's Choice" in the context of the disposition. *See* W.Va.Code § 49–6–5 (2014) (pertaining to disposition after circuit court adjudicates child as being abused or neglected). However, nothing in *Doris S.* or *Daniel D.* restricted a court's consideration of a parent or guardian's silence to the disposition stage. Syllabus point two of *Doris S.* expressly addresses "culpability," and culpability for abuse and neglect is the focus of the adjudicatory stage. Indeed, in *Doris S.,* this issue was discussed with regard to David E.'s *adjudication* as an abusing parent.

Accordingly, we conclude that the circuit court erred as a matter of law when ruling that silence absent an affirmative remedial order or duty cannot constitute evidence of civil culpability for abuse and neglect. The circuit court's legal conclusion is contrary to syllabus point two of *Doris S. See* 197 W.Va. at 492, 475 S.E.2d at 868. Furthermore, the circuit court should have considered R.C.'s silence as evidence that he abused K.P. As discussed herein, K.P. gave multiple consistent statements about how her stepfather touched her breasts, buttocks, and vaginal area, and about his request on July 1, 2013,

for oral sexual gratification. R.C. utterly failed to respond to those allegations.

## B. Evidence of Abuse

 Next we examine whether the circuit court erred in concluding that the DHHR did not present clear and convincing evidence that the respondents R.C. and A.C. committed abuse. With regard to the DHHR's burden, we have repeatedly held that

> " ' " 'W.Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . . by clear and convincing proof." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden.' Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994)." Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

Syl. Pt. 3, *In re F.S.*, 233 W.Va. 538, 759 S.E.2d 769 (2014). Sexual abuse may be proven solely with the victim's testimony, even if that testimony is uncorroborated. Syl. Pt. 5, *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981).[12]

### 1. The Respondent Stepfather R.C.

 Although the circuit court found that K.P. gave consistent statements regarding the sexual abuse, the court nonetheless found reasons to question K.P.'s veracity. Our review of the entire record leaves us with the definite and firm conviction that those reasons were unfounded. *See Tiffany Marie S.*, 196 W.Va. at 225–26, 470 S.E.2d at 179–80, syl. pt. 1 (explaining that finding of fact is clearly erroneous when, although there is evidence to support it, reviewing court on entire evidence is left with definite and firm conviction mistake was committed). The

lack of testimony from R.C. further highlights the questionable grounds upon which the circuit court based its decision to disregard K.P.'s assertions.

First, the circuit court found that K.P.'s strained relationship with her mother and strong desire to live with her father provided an "alternate explanation" for the allegations of abuse. The DHHR and GAL dispute that K.P. would fabricate these allegations so she could move out of her mother's home. During the interview with Dr. Bean, K.P. explained her understanding that as soon as she turned fourteen years old, she could choose the parent with whom she would reside. Her father, R.P., confirmed that this was also his understanding and that he and K.P. had discussed it. When K.P. disclosed the sexual abuse, her fourteenth birthday was just seven weeks away. The petitioners argue that K.P. would have no reason to fabricate the allegations so close in time to when she thought she could elect where to live. Moreover, K.P. acknowledged the seriousness of the allegations, and there was evidence that she and her stepfather otherwise got along well. The petitioners assert that K.P.'s credibility is supported by the manner in which she disclosed the sexual abuse without embellishing or dramatizing the nature of what occurred.

Second, the circuit court found an inconsistency in K.P.'s reports regarding the frequency of the abuse she alleged had occurred throughout the year leading up to July 1, 2013. The circuit court made this finding despite having previously ruled, when quashing a subpoena for K.P.'s testimony, that her statements were all consistent. According to the circuit court, the inconsistency was that K.P. told CPS Worker Miller that the abuse occurred "every other day for a year"; she told Dr. Bean that it occurred "at least a couple times a week" for a year; and she told Dr. Miller that it occurred "around fifty times."

Contrary to the circuit court's ruling, we observe that K.P.'s statements concerning the frequency of the prior abuse are not

---

12. *Beck* was a criminal case requiring proof beyond a reasonable doubt, which is a higher burden of proof than the clear and convincing standard applicable to abuse and neglect cases.

appreciably different. For instance, "every other day" is analogous to a "couple times a week," particularly to a young person. Moreover, a review of the record shows that K.P.'s statements about the frequency of the prior occurrences were not as specific as the circuit court's findings suggest. In her videotaped interview with CPS Worker Miller, K.P. said the abuse occurred, "I don't know, like every other" night. In her video-taped interview with Dr. Miller, she said that "some weeks" the abuse occurred "like two times," while other weeks it did not happen at all. In fact, it was Dr. Miller who suggested the number fifty to her, and she agreed that it was "probably something like" fifty times and "maybe" fifty times. Importantly, K.P. never claimed to be able to state the exact number of prior occurrences.[13] K.P.'s inability to be more specific is readily attributable to the frequency of the conduct, that the conduct occurred throughout an entire year, and because the conduct escalated over time.[14]

Third, although the circuit court found that the remainder of K.P.'s information was consistent across the several interviews, the court described her allegations as "very simple" and lacking witnesses or corroborating evidence. In a subsequent order denying a motion to stay, the circuit court elaborated on what it meant by "very simple" by comparing K.P.'s report to that of the child vic-

tim in *In re F.S.*, 233 W.Va. 538, 759 S.E.2d 769 (2014). The victim in *F.S.* provided vivid accounts of sexual molestation, complete with "distinct graphic sensory details" about her abuser's ejaculations. *Id.* at 545–46, 759 S.E.2d at 776–77. The circuit court found that the account in *F.S.* was "a far cry from the account of abuse presented in this case, an account one examining psychiatrist [Dr. Miller] described as 'very simple.'"

The circuit court's reasoning about the "simple" nature of K.P.'s allegations is wholly unfounded. Not all sexual abuse of children involves the same type or degree of wrongful conduct. Fortunately, K.P. was not subjected to penetration or ejaculation, as was the child in *F.S.* Just because K.P. did not report being subjected to more graphic forms of sexual abuse, does not mean she fabricated the report of her stepfather fondling her and seeking oral sexual gratification.

A review of the testimony of the individuals who interviewed K.P., and of the video recordings in the appendix record, confirms the circuit court's finding that K.P. was consistent in describing the abusive conduct. Even when the respondents' expert Dr. Miller challenged her, K.P. did not change her report.[15] Moreover, while K.P.'s report of the sexual abuse on July 1, 2013, was not particularly graphic in nature, it was detailed. She described exactly where she was and what she was doing when her stepfather

13. Dr. Miller was apparently not troubled by this alleged inconsistency. At the adjudicatory hearing, he was asked, "You talked about inconsistencies and consistencies. She has stated that this sexual abuse occurred about every other day. She told you about 50 times. That would—that's not consistent; is it?" Dr. Miller responded, "It's not inconsistent—[that] doesn't necessarily bother me...."

14. During the videotaped interview, K.P. told Dr. Miller that her stepfather's conduct throughout the preceding year was not the same, rather, "it kinda got more touchy throughout." She said that the first couple of times, R.C. just touched her back, but subsequently he touched her "butt" and other areas. She had not realized the initial occurrences were meant to be sexual. Other times, he rubbed her vaginal area, which she did realize was sexual, but she was afraid to tell anyone.

15. For example, Dr. Miller raised the issue of K.P. texting private photographs to an online

boyfriend. She admitted having done so, and that it was a mistake. Dr. Miller asked her,

> Like you said, you know, you weren't thinking and you'll never do it again. What if [R.C.] just does the same thing? [He] wasn't thinking and will never do it again ... Why can't we just leave it at that? It's good enough for you, it should be good enough for him. Know what I'm saying? I mean we all make mistakes. You made some mistakes. Nobody can have the best judgment all the time. Nobody really got hurt. I mean what you did didn't, nobody died. So why can't he just have the benefit of this, he made a mistake and he wasn't thinking and he won't do it again?

Later, Dr. Miller said "it's really not so much about [your stepfather], it's really about your mom?" When K.P. tried to explain that it was about both of them, Dr. Miller insisted that it could not be about both of them. Despite these challenges, K.P. did not back down from her report of abuse.

began touching her; described where he touched her; and repeated what he said to her. K.P. also provided a detailed recounting of what both R.C. and A.C. said when trying to convince her not to reveal the misconduct. R.C. rebutted none of K.P.'s statements. Moreover, it is evident that something occurred on July 1, 2013, to cause R.C. to telephone his wife and volunteer that he had not inappropriately touched the child.

Although K.P. does not exhibit any indications of psychological trauma, Dr. Bean explained that not all victimized children do.[16] Finally, the absence of witnesses to the abuse is not a basis to disbelieve K.P. It is axiomatic that most sexual abuse of children is not committed in front of an audience.

In considering the evidence in the case at bar, we are assisted by our discussion in *F.S.* about the measure of proof necessary to prove civil abuse and neglect:

> This is a classic case of the inability of a trial court to ascertain, with complete certainty, the truth of the allegations of abuse. As indicated by the circuit court's adjudicatory order, one could quite effortlessly compile an inventory of doubts and skepticism based upon the evidence presented. The evidence is simply not crystal clear, beyond all doubt. However, that is not the standard to be employed in an abuse and neglect case. In reviewing the entirety of the evidence, this Court must adhere to the appellate standard of review ... according significant weight to the circuit court's credibility determinations while refusing to abdicate our responsibility to evaluate the evidence and determine whether an error has been committed.
>
> It is imperative to note that the evidence in an abuse and neglect case does not have to satisfy the stringent standard of beyond a reasonable doubt; the evidence must

establish abuse by clear and convincing evidence. This Court has explained that " 'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Brown v. Gobble,* 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996) (internal citations omitted). We have also stated that the clear and convincing standard is "intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cramer v. W.Va. Dept. of Highways,* 180 W.Va. 97, 99 n. 1, 375 S.E.2d 568, 570 n. 1 (1988); see also *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (holding that party with burden of persuasion may prevail only if he can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable.' ").

*F.S.,* 233 W.Va. at 546, 759 S.E.2d at 777. The same considerations are present in the instant case. Although the circuit court may have viewed the evidence as less than certain, the DHHR did not need to meet the higher standard of a criminal case. All that was required was clear and convincing evidence.

After carefully considering the evidence in the entire record, and taking into account R.C.'s silence in the face of these serious allegations, we conclude that the circuit court erred in finding a lack of clear and convincing evidence that R.C. sexually abused his stepdaughter. Accordingly, we find that the circuit court erred by not adjudicating K.P. as an abused child and R.C. as an abusing parent. *See* W.Va.Code §§ 49–1–3, 49–6–2(c).[17]

---

16. Dr. Miller testified that K.P.'s lack of a psychological diagnosis and symptoms is "clinically difficult to understand." He testified, "in my experience an individual who has been profoundly, persistently, systematically and severely abused for over a decade is not an individual [who] would be asymptomatic." However, neither the DHHR nor K.P. claimed that the abuse was as severe as what Dr. Miller insinuated in this testimony. Moreover, K.P. did not reside with A.C. and R.C. for all of the prior decade,

having lived with her grandmother for several years.

17. West Virginia Code § 49–1–3(1) provides, in relevant part, that

> "Abused child" means a child whose health or welfare is harmed or threatened by:
> (A) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person

#### 2. The Respondent Mother A.C.

■ Turning to the allegations against A.C., the DHHR asserted she failed to protect K.P. and engaged in emotional abuse of K.P. There is no evidence that A.C. knew, or had sufficient facts to know, of the sexual abuse before K.P. disclosed it. As such, A.C. should not be adjudicated as abusive for a failure to protect her daughter from sexual abuse in the time period before the disclosure was made.[18] The circuit court erred, however, in failing to recognize that A.C.'s actions after the disclosure constituted emotional abuse of K.P. West Virginia Code § 49–1–3 defines "abused child" to include a child whose health or welfare is harmed or threatened by a parent who "inflicts [or] attempts to inflict ... mental or emotional injury, upon the child[.]"[19]

Once K.P. revealed the allegations of sexual abuse, A.C. undertook a course of action directed at preventing K.P. from reporting the abuse to the authorities. Even before talking to her daughter about the allegations, A.C. claimed that R.C. had only rubbed the child's shoulders. Then, during the discussion in the car at the gas station, A.C. tried to persuade K.P. to keep quiet by pretending to cry, by threatening that the allegations would ruin R.C.'s life and hurt A.C.'s job, and by saying that sexual molestation is something that the victim "must live with in shame." Moreover, at the sheriff's office, A.C. asked if lie detector tests could be administered and disclosed to the detective that K.P. had texted pictures of herself to an online boyfriend. A.C. engaged in intimidation and psychological tactics in an effort to procure her daughter's silence. In short, when issues arose regarding the safety and well-being of her daughter, A.C. chose to protect her husband instead of her daughter—a position she has maintained throughout these proceedings.

■ The post-disclosure conduct of a parent, guardian, or custodian may constitute abuse and neglect. *See Doris S.,* 197 W.Va. at 492, 475 S.E.2d at 868, syl. pt. 1 (stating that statutory definition of "abused child" implicitly includes child whose health or welfare is harmed or threatened by parent who fails to cooperate in identifying perpetrator of abuse). Moreover, we have recognized that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Charity H.,* 215 W.Va. 208, 217, 599 S.E.2d 631, 640 (2004) (quoting *Doris S.,* 197 W.Va. at 498, 475 S.E.2d at 874).

Such issues were recently addressed in *In re K.C.,* No. 14–0493, 2014 WL 6634520 (W.Va. Supreme Court, Nov. 24, 2014) (memorandum decision). In *K.C.,* a mother adamantly denied the allegations of sexual abuse that her daughter made against the mother's boyfriend. For approximately one and one-half years after the disclosure, the mother did not support her daughter, failed to believe the disclosure, and did nothing to assist the State in investigating or developing a case against the child's abuser. *Id.* at *3. The mother's conduct led a therapist to conclude that there was an irreparable break in the relationship between the mother and child. *Id.* Ultimately, we affirmed the circuit court's conclusion that the mother's conduct was also abusive.

In addition, the testimony of K.P.'s father, R.P., corroborated that A.C. called their daughter vulgar and hurtful names and obsessed about what the child ate. Moreover, A.C. admitting smacking K.P. in the mouth a

---

to inflict, physical injury or mental or emotional injury, upon the child or another child in the home; [or]
(B) Sexual abuse or sexual exploitation[.]

**18.** *See Doris S.,* 197 W.Va. at 492, 475 S.E.2d at 868, syl. pts. 3, 4, and 7 (explaining that statutory definition of "abused child" includes child whose

parent, guardian, or custodian "knowingly" allows another person to commit abuse, and "knowingly" means having sufficient facts from which to recognize that abuse occurred.).

**19.** *See supra* note 17.

few months earlier. The circuit court concluded that the name-calling and the physical striking, even if true, were isolated events that did not rise to the level of parental abuse and neglect. Furthermore, the circuit court found no evidence that K.P. was denied necessary food, noting that one parent's "obsession" can be another parent's "balanced diet." If we were to view this conduct in a vacuum, we might agree with the circuit court. However, when considering the entire record, including A.C.'s behavior when her daughter revealed the sexual abuse, A.C.'s prior conduct constitutes further evidence that she emotionally abused K.P.

Accordingly, we conclude that the circuit court erred in finding a lack of clear and convincing evidence that A.C. emotionally abused K.P. and, therefore, erred by failing to adjudicate A.C. as an abusing parent. *See* W.Va.Code §§ 49–1–3, 49–6–2(c).

### 3. I.C.–1, G.C., and I.C.–2

There are no allegations that R.C. or A.C. directly abused the other three children in the home, all of whom are R.C.'s biological children. However, West Virginia Code § 49–1–3(1)(A) defines "abused child" to include "another child in the home" and "a child whose health or welfare is harmed or threatened[.]"[20] We have held that

> [w]here there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodi-

an, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va.Code, 49–1–3(a) (1994).

Syl. Pt. 2, *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995). Because the respondents are abusing parents with regard to K.P., the health and welfare of the other children in the home is also at risk. Accordingly, the circuit court erred by refusing to adjudicate I.C.–1, G.C., and I.C.–2 as abused children.

### IV. Conclusion

For the reasons set forth above, the circuit court erred when failing to adjudicate R.C. and A.C. as abusing parents and K.P., I.C.–1, G.C., and I.C.–2 as abused children. Therefore, we reverse the circuit court's September 3, 2014, order and remand this case to the circuit court for entry of adjudication orders consistent with this opinion, and for post-adjudication proceedings and disposition.[21]

Reversed and remanded with directions.

---

20. *See supra* note 17.

21. Many of the cases cited in this opinion addressed both the adjudication and the ultimate disposition. However, only the issue of adjudication is before us in the appeal *sub judice.* Any

post-adjudicatory requirements and the disposition will be matters for the circuit court to address on remand, and nothing in this opinion should be construed as directing the circuit court as to how it should rule on those issues.