433 S.E.2d 518

**In re LACEY P., Shanna P. and Nicholas P. and Michelle S.**

**No. 21528.**

Supreme Court of Appeals of
West Virginia.

Submitted May 4, 1993.

Decided June 24, 1993.

Ernest M. Douglass, Parkersburg, for Tauna P.

Teresa Tarr, Michele L. Rusen, Asst. Pros. Attys., for West Virginia Dept. of Health and Human Resources.

Susan Simmons, Elizabeth, for infants.

BROTHERTON, Justice:

This case involves the appeal of Tauna P., the mother of the above captioned children, from the June 12, 1992, order of the Circuit Court of Wood County which terminated her parental rights, placed the children into protective custody, including her unborn child, and ordered that the Department of Health and Human Services assist the appellant in being surgically sterilized.

The appellant/mother is approximately twenty-three years old. She has five children and has never been married. The children's ages range from approximately six years to one year. On October 4, 1991, the West Virginia Department of Health and Human Services (HHS) filed a petition

in the Circuit Court of Wood County, pursuant to W.Va.Code § 49–6–3 (1990), seeking temporary custody of Lacey, Shanna, Nicholas, and Michelle. Shortly thereafter, the appellant became pregnant with her fifth child. A preliminary hearing was held on October 15, 1991, at which time the court heard evidence. A review of the transcript reveals that since 1989, the appellant has been investigated on numerous occasions by various social service agencies in Ohio and West Virginia for allegations of abuse and neglect of her children. The HHS contends that the appellant also has a history of moving from county to county, which coincided with the social services agencies' investigations of charges of abuse and neglect.

In early 1991, the appellant was living in Washington County, Ohio, when she was charged with neglecting her children. In April, 1991, the appellant agreed to a protection plan in order to prevent the removal of the children. Services were set up for budgeting, parenting skills, housekeeping skills, and nutritional education. The appellant never attended any of the appointments or classes. In May, 1991, the Ohio Department of Human Services planned to take the children from the home because of allegations of drug use and child abandonment, but the appellant moved to Wood County, West Virginia, before they could be removed. Those allegations were not substantiated. On May 31, 1991, the West Virginia Department of Health and Human Services received a referral from the Washington County, Ohio, Human Services Department regarding the appellant's neglect charges. Child Protective Services Worker Tracy Morris was assigned to the case.

On August 8, 1991, Morris met with the appellant and discussed enrolling the children in pre-school, infant stimulation classes, and daycare. The appellant failed to keep three appointments to enroll her oldest child, Lacey, in the Headstart Program. By the time Lacey was enrolled, the program was already full for the year. The appellant then enrolled Lacey and Shanna in pre-school, but their attendance was sporadic.

On August 26, 1991, the appellant informed the HHS that her electricity was going to be shut off for nonpayment. The HHS used funds to pay the overdue bill, and shortly thereafter, Morris paid a home visit and observed the appellant strike Shanna and Nicholas.

On August 27, 1991, the appellant again contacted the HHS and told them that her water was being shut off. The appellant also asked if Michelle's father could move in with her. Morris told the appellant that that was not a good idea because of Mr. Smith's past physical abuse of Shanna and because he hit all of the children.[1] The appellant admitted that the father stayed in the house on the weekends and that she was aware that he hit the children. Michelle's paternal grandmother, Pat, was already living with the appellant and the children, and was believed to be a poor influence.

On September 11, 1991, Morris visited the home again and noted that the children were bruised and the baby, Michelle, was left unattended on an elevated changing table. Michelle also had a case of diaper rash so severe that she was bleeding. Morris reported that the water was still off and that water was being kept in large, unrefrigerated, unprotected containers, in which the children played. On that date, the appellant signed a protective services plan whereby she agreed to provide a safe, clean, and healthy environment for the children, and keep all her utilities on and paid by budgeting her finances. However, by September 16, 1991, all the children were sick with varying degrees of fever, diarrhea, congestion, and coughing. Morris took the appellant and the children to the emergency room, and it was determined that Nicholas had pneumonia and an ear

1. In October, 1990, while Michelle's father, Mike, and her grandmother, Pat, were watching the children, Shanna was severely beaten and bruised by either the father or Pat. There are also other incidences where teachers or daycare providers noted bruises on the children. At one point, Lacey told the daycare provider that her mother hit her with a board. They also noted that the children's clothes were often filthy, ill-fitting, and inappropriate.

infection. At that time, the appellant was given several prescriptions for the children and asked to bring stool samples back to the hospital in order to determine the cause of the diarrhea. Follow-up appointments were also made.

On September 19, 1991, the appellant signed a protection plan to prevent the removal of her children. The plan stated as follows:

[T]he children are not to be left alone with any member of the _____ family, Mike, [Michelle's father,] and Pat, [Michelle's grandmother], included, or any other person who is not suitable, intoxicated, or under the influence of drugs. The children are not to be hit in any way. Discipline shall be enforced by time-outs or standing in the corner. All shots are to be caught up by October 30th. All medical attention shall be sought as soon as any child appears ill. Follow-up for this treatment will be done as directed.... [T]he children were to attend pre-school and/or daycare every day unless ill or services aren't available ... Diapers will be checked every hour and changed if at all messy ... and ... rent and utility bills will be paid on time because the utilities had all been shut off.

Unfortunately, the appellant failed to follow any part of that plan. Prescriptions were not filled, no samples were returned to the hospital, and the children were not taken back for their follow-up appointments, with the exception of Shanna, who saw a physician who wanted tests performed. Those tests were not done. By October 4, 1991, all four children had pneumonia.

On October 4, 1991, the HHS filed a petition in the Circuit Court of Wood County seeking temporary custody of the four children. By order dated October 15, 1991, the court granted the HHS' request. On November 8, 1991, the court held an adjudicatory hearing, and the appellant stipulated to the allegations regarding the medical neglect. The court ruled that the children were neglected children as defined by W.Va.Code § 49–1–3(c) and § 49–1–3(g)(1)(A) (1991), but allowed the appellant an out-of-home improvement period during which the children remained in foster care.[2]

On December 15, 1991, the court signed an agreed order approving the family case plan prepared by the Department of Human Services. On February 4, 1992, the oldest child, Lacey, was returned to the appellant's home because she had been acting out in school and it was believed that her conduct occurred because she missed her mother. The other children remained in foster care. On March 20, 1992, the court conducted a review of the improvement period. At that time, the evidence showed that the appellant had not complied with any of the requirements in the family case plan. Further, since Lacey had been returned to the appellant's care on February 4, 1992, the child had missed several days of pre-school, her behavior was quite violent while she was with her mother, and the child was dressed in old, ill-fitting, inappropriate clothes instead of wearing the new clothes purchased for her while she was in foster care. It was also revealed that the appellant was approximately four months pregnant, although she had not received any prenatal care. The appellant

2. As part of the improvement period, the court required that the appellant do the following: (1) read a chapter of the STEP book and write a one page report each week; (2) attend the next available STEP classes; (3) secure a doctor and dentist and take children to all routine appointments; (4) seek medical and dental help when the children become ill or need services; (5) enroll children in and have them regularly attend programs to enrich their development; (6) volunteer at the Wee People Pre-school; (7) attend Al–Anon meetings; (8) have no contact with any member of the family of Michelle's father; (9) initiate individual therapy; (10) keep a journal of thoughts, ideas and daily activities; (11) seek employment or apply for AFDC when children are returned; (12) make a monthly budget; (13) move to safe, adequately-sized housing; (14) obtain utilities in her name; (15) notify her case worker whenever she moves; (16) provide a list to the Department with the name and number of two places where she sought employment; (17) attend all regularly scheduled visits with the children; and (18) notify the Department if she cannot visit her children (R. at 23–27).

stated that she had intended to have her tubes tied after Michelle was born, but had not had it done.

On May 1, 1992, the court reviewed the improvement period and ordered it discontinued. On June 12, 1992, a dispositional hearing was held, and the court terminated the appellant's parental rights. Evidence taken at that hearing was essentially the same as that heard in October, 1991, and March 20, 1992. The appellant's caseworker, Ms. Morris, also recommended termination of the parental rights. Ms. Morris noted that during the improvement period, the appellant only made an effort to follow the plan while living at the Eve Shelter, where she attended some meetings and had two hours of counseling. Once she left the shelter, Ms. Morris stated the appellant reverted to her old habits. The court then ordered that:

[I]nasmuch as the respondent-mother has indicated upon the record that she desires to be surgically sterilized after the birth of this unborn child, the Court hereby ORDERS that the Department of Health and Human Services assist the respondent-mother and ensure that such procedure is performed after the birth of this child, and to provide financial assistance as is available for such procedure to be performed.

The court also held that the Department of Human Services "shall take protective custody ... and maintain such custody until further order of the Court" following the birth of the fifth child. It appears that the child is, at this moment, still in the appellant's home. Following the birth of the fifth child, the appellant voluntarily opted for a five-year Norplant contraceptive implant rather than a tubal ligation.

It is from this ruling that the appellant files the current appeal. Specifically, the appellant argued that the court erred in (1) terminating the respondent's improvement period early; (2) terminating the respondent's parental rights; (3) making its findings based upon "abundantly clear" evidence rather than by clear and convincing evidence as required by W.Va.Code § 49–6–2(c); (4) that the court exceeded its juris-diction when it ordered the West Virginia Department of Health and Human Services to insure that the respondent mother be sterilized; and (5) that the court exceeded its jurisdiction when it ordered the West Virginia Department of Health and Human Services to take custody of the unborn child.

### I.

The appellant argues that the court erred in terminating her improvement period after only six months, when the March 9, 1992, report of the Department of Health and Human Services provided for a twelve-month improvement period. Specifically, the appellant contends that W.Va.Code § 49–6–5(c) (1992) forbids the court from terminating the improvement period less than six months after it was granted. We disagree.

As in any child welfare case, the best interests of the child are foremost in cases involving the termination of parental rights. "[A]ll parental rights in child custody matters are subordinate to the interests of the innocent child." *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912, 916 (1989). In syllabus point 1 of *Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), this Court held:

"[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

While there is no absolute right to an improvement period in this State, W.Va. Code § 49–6–2(b) provides that an improvement period shall be allowed unless there are compelling reasons to justify the denial of an improvement period. *See Matter of Jonathan P.*, 182 W.Va. 302, 387 S.E.2d

537 (1989). Thus, the Legislature clearly intended to encourage improvement periods prior to the termination of any parental rights. In *State ex rel. W.Va. Department of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), the Court quoted *State v. Stritchfield*, 167 W.Va. 683, 692–93, 280 S.E.2d 315, 321 (1981):

> ... the statute presumes the entitlement of a parent to an opportunity to ameliorate the conditions or circumstances upon which a child neglect or abuse proceeding is based pending final adjudication, no doubt in recognition of the fundamental right of a parent to the custody of minor children until the unfitness of the parent is proven....

*Id.* 177 W.Va. at 691, 356 S.E.2d at 184.

■ At the November 8, 1991, hearing, the appellant was granted an improvement period for an indefinite time. The improvement period was terminated after approximately six months.[3] Contrary to the appellant's argument, nothing in W.Va.Code § 49–6–5(c) or § 49–6–2(b) mandates a twelve-month improvement period. West Virginia Code § 49–6–2(b) permits a pre-dispositional improvement period:

> In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed *an improvement period of three to twelve months* in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circum-

stances to justify a denial thereof, but may require temporary custody in the state department or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-d of this chapter. (Emphasis added.)

By contrast, W.Va.Code § 49–6–5(c) contemplates a post-dispositional improvement period not to exceed twelve months:

> The court may as an alternative disposition allow to the parents or custodians an improvement period *not to exceed twelve months*. During this period the parental rights shall not be permanently terminated and the court shall require the parent to rectify the conditions upon which the determination was based. No more than one such post-dispositional improvement period may be granted. The court may order the child to be placed with the parents, a relative, the state department or other appropriate placement during the period. At the end of the period the court shall hold a hearing to determine whether the conditions have been adequately improved, and at the conclusion of such hearing, shall make a further dispositional order in accordance with this section. (Emphasis added.)

Thus, neither the post-dispositional improvement period nor the pre-dispositional improvement period is required to extend for twelve months.[4]

---

**3.** The improvement period in this case began following the November 8, 1991, adjudicatory hearing and terminated on May 1, 1992. Counsel made references to a twelve-month period, but no definite time limitation was set out at that hearing.

**4.** The procedure under which an improvement period and subsequent termination of parental rights can happen is structured by statute. In *State v. T.C.*, 172 W.Va. 47, 303 S.E.2d 685 (1983), this Court stated that before any court can make any of the dispositional alternatives found under W.Va.Code § 49–6–5, the court must have held a hearing under W.Va.Code § 49–6–2 to determine whether the child was abused or neglected. *Id.* at 688. Only after a determination of neglect or abuse under W.Va.

Code § 49–6–2 can the HHS proceed under W.Va.Code § 49–6–5. *Id.* Under § 49–6–5, the HHS is required to file with the court a copy of the child's case plan, describing what is planned for the child.

Once the court has the case plan, the court will then proceed with a dispositional hearing, with both the petitioner and respondents having an opportunity to be heard. Following the dispositional hearing, the court has the following options: (1) Dismiss the petition; (2) Refer the child, the parents and other family members to an agency for assistance and dismiss the petition; (3) Return the child to the parent's home under the supervision of the state department; (4) Order terms of supervision meant to assist the child and parents; or (5) Upon finding that the abusing parent was unwilling or unable to

In this case, the improvement period was allowed under W.Va.Code § 49–6–2(b), the pre-dispositional improvement period section, which allows a time frame of three to twelve months. The appellant's improvement period lasted approximately six months, well beyond the three-month minimum. Further, regardless of which Code section permitted the improvement period, nothing in either W.Va.Code § 49–6–2(b) or W.Va.Code § 49–6–5(c) mandates that an improvement period must last for twelve months. It is within the court's discretion to grant an improvement period within the applicable statutory requirements; it is also within the court's discretion to terminate the improvement period if the court is not satisfied that the defendant is making the necessary progress before the twelve-month time frame has expired. The only minimum time necessary by statute is the three months required in the pre-dispositional section, W.Va.Code § 49–6–2(b).

Unfortunately, there is little evidence of any attempt by the appellant to ameliorate the circumstances which precipitated the removal of her children. The only evidence of any improvement occurred while the appellant lived in a shelter, when she attended a few Al–Anon and AA meetings, as well as a women's support group and two hours of counseling. As soon as she left the shelter, however, she reverted to her old habits and failed to attend any meetings, counseling sessions, classes, do the STEP book reports, journals, or the required volunteer work. Further, at the March 20, 1992, hearing, it was revealed that she was living with another man with a drinking problem. She also missed several scheduled visits with her children. Thus, it was clear to the lower court, as it is to this Court, that if she could not achieve even a few of the goals in her improvement plan while the children lived away from her, then she would have even less success while she had to care for five children. Consequently, we conclude that the Circuit Court of Wood County did not exceed its authority in terminating the improvement period when it did.

## II.

In her second argument, the appellant contends that her parental rights were improperly terminated under W.Va. Code § 49–6–5(c), which provides that parental rights shall not be terminated during the improvement period. In this case, the parental rights were terminated after the improvement period was discontinued. Thus, W.Va.Code § 49–6–5(c) was not violated. Since the appellant does not argue that the court erred in terminating the parental rights based upon the merits of the case, neither shall we. Suffice it to say that the facts more than supported the court's decision to terminate her parental rights based upon her neglect of the children.[5]

## III.

The appellant next complains that the court used the wrong standard in making its decision to terminate parental rights. The appellant argues that W.Va.Code § 49–6–2(c) requires that any finding be made by "clear and convincing" evidence rather than the "abundantly clear" evidence standard used by the Wood County Circuit Court in this case. Again, we disagree.

While we agree that the standard of proof for terminating parental rights is clear and convincing evidence, we have never required that those magic words be uttered in order to properly ter-

provide adequately for the child's needs, commit the child to a welfare agency or a suitable person who will be appointed guardian by the court. W.Va.Code § 49–6–5(a) (1992). Under W.Va.Code § 49–6–5(c), the legislature permitted the court to allow, as an alternative disposition, the parents a second chance at an improvement period not to exceed twelve months.

**5.** The appellant also claimed that the trial court erred in placing her unborn child in protective custody. Nothing in W.Va.Code § 49–6–1 *et seq.* forbids the court's actions. Indeed, given her history, the court would have been remiss to not flag HHS that the child's care needed to be monitored. The infant is currently living with the appellant and is being monitored by Ms. Morris for HHS. "Protective custody" merely means the child would come under the auspices of HHS once born. No decision to terminate parental rights could happen until the statutory requirements, listed in footnote 4, were met.

minate parental rights. *State v. Krystal T.*, 185 W.Va. 391, 407 S.E.2d 395 (1991). The State claims that the phrases "abundantly clear" and "clear and convincing evidence" are interchangeable. In *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), the Court affirmed a termination of parental rights, stating that "the record is abundantly clear that these parents were unfit, and that accordingly, the lower court should have terminated parental rights...." *Id.* at 657, 408 S.E.2d at 409. Although it would be preferable for the trial courts to use the phrase "clear and convincing evidence," we cannot find that the use of the words "abundantly clear" was enough to negate the finding in this case.

## IV.

The appellant's final claim is perhaps the most provocative. The appellant argues that the trial court exceeded its jurisdiction by ordering that the Department of Health and Human Services insure that she be sterilized.[6] The appellant argues that her right to bear children is a "fundamental and natural right" under the United States Constitution, being one of those rights which "grows out of the nature of man and not law." She also argues that the court order violates her personal rights under the United States Constitution because the order invades her right to personal security in her life, limb, body, health, and personal liberty.[7]

The State counters that it did not order the appellant sterilized; instead, it ordered the HHS to assist the appellant in her expressed desire to be sterilized.[8] Further, although the appellant appealed the court's order, she voluntarily obtained a five-year Norplant contraceptive implant. Thus, the issue of whether the court could order that the defendant be sterilized is moot. It seems, however, that such an

---

**6.** West Virginia Code § 27-16-1 *et seq.* (1992) authorizes the sterilization of mental defectives, as opposed to criminals.

**7.** *See also* Note, *Sterilization Under Federally Funded Family Planning Programs,* 11 New England Law Review 589 (1976).

**8.** This Court acknowledges the appellant's constitutional argument regarding her right to bear children. However, just as the Constitution limits our right to free speech in cases of "fighting words" or speech that endangers public safety, so too must any right to bear children be limited by actions which endanger the safety of those children. This Court has an equal duty to protect the constitutional rights of children, set out in Amendment XIV to the United States Constitution. The Constitution guarantees their right not to be deprived of life, liberty, or property without due process of law. Further, Article III of the Constitution of the State of West Virginia [Bill of Rights] provides:

§ 1. All men [persons] are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety.

The right to bear children carries with it the responsibility for both parents to care for, nurture, and provide for the children to the best of their joint abilities. At a minimum, the parents must see to the children's health and safety and equip the children, through parenting and education, to provide for themselves as adults. In other words, the parents must help the child to obtain a quality and productive life.

The facts of this case show parents who care little for the welfare of their children. Unfortunately, this is not an isolated situation—similar cases appear before this Court on an increasingly regular basis. We find ourselves settling for temporary solutions, such as removing the abused children to foster care, rather than doing anything to prevent reoccurrences. Most of these children have little or no chance of achieving their constitutional rights to property, happiness and safety, let alone a normal life.

Sex education is a necessity in a state with a high rate of teenage pregnancies and illegitimate births. Of even greater necessity is a program emphasizing the awesome responsibilities that parents owe their children, particularly where there seems to be a complete lack of responsibility for the children they create. While it seems unlikely that this State would require sterilization of men and women who are convicted of a felony related to the neglect and/or abuse of the children they conceive, the introduction of a long term but temporary contraceptive implant (Norplant) makes this option more palatable. However, this decision belongs in the hands of the Legislature or HHS, not the Court. What we do emphasize is that something must be done to stop the tide of neglected, abused children. It is not fair to them, and the State cannot afford the results of unchecked neglect. As we noted above, a constitutional right is guaranteed only until abused. Neither this State nor the children can afford to let this abuse continue.

order could not be upheld. Another jurisdiction has concluded that statutory authority is required before the court can order involuntary sterilization even in felony child abuse cases.[9] No case law seems to exist in any jurisdiction in which involuntary sterilization was ordered in situations involving misdemeanor child abuse or unprosecuted cases of child abuse.

Accordingly, we affirm the June 12, 1992, order of the Circuit Court of Wood County.

Affirmed.

---

**9.** *See Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) for an early decision approving of a Virginia statute which permitted the sterilization of "imbeciles." *See also Smith v. Superior Court of the State of Arizona in and for Coconino County,* 151 Ariz. 67, 725 P.2d 1101 (1986), in which the Arizona Supreme Court held that the trial court did not have jurisdiction to require that defendants convicted of felony child abuse be sterilized as a condition of a reduced sentence, absent statutory authorization. The Arizona Court noted that some jurisdictions recognized the power of courts to order sterilization, although the Court found the majority of jurisdictions required statutory authorization:

> Admittedly, there is a minority view authorizing sterilization of incompetents without specific statutory authority. *Wyatt v. Aderholt,* 368 F.Supp. 1383 (M.D.Alaska 1974); *In re C.D.M.,* 627 P.2d 607 (Alaska 1981); *In re Guardianship of Hayes,* 93 Wash.2d 228, 608

P.2d 635 (1980). The California Supreme Court has gone so far as to invalidate a specific statute prohibiting sterilization. *Conservatorship of Valerie N.,* 40 Cal.3d 143, 154, 707 P.2d 760, 771–72, 219 Cal.Rptr. 387, 404 (1985)....

> More recent cases have held that sterilization should not be allowed absent a specific statute authorizing such procedure. This appears to be the majority view. *See In re C.D.M.,* 627 P.2d at 607; *Guardianship of Tulley,* 83 Cal.App.3d 698, 700, 146 Cal.Rptr. 266, 268 (1978), *cert. denied,* 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979); Annot., "Jurisdiction of Court to Permit Sterilization of Mentally Defective Person in Absence of Specific Statutory Authority," 74 A.L.R.3d 1210, 1212 (1976).

at 69–70, 725 P.2d at 1103–04. *See* Annot., *Validity of Statutes Authorizing Asexualization or Sterilization of Criminal or Mental Defectives,* 53 A.L.R.3d 960, 963–64 (1973).