**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

September 2016 Term

_____

FILED
**September 15, 2016**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos.  15-1042 and 15-1043

_____

**In Re:  D. M.**

_____

**Appeals from the Circuit Court of Raleigh County**
**The Honorable John A. Hutchison, Judge**
**Case No. 14-JA-144**

_____

**AFFIRMED**

_____

Submitted: September 7, 2016
Filed: September 15 , 2016

Timothy P. Lupardus, Esq.
Lupardus Law Office
Pineville, West Virginia
Counsel for Petitioner Buddy M.

Matthew Bradford, Esq.
Lusk & Bradford, PLLC
Beckley, West Virginia
Guardian *Ad Litem* for Buddy M.

Joseph M. Mosko, Esq.
Thad A. Bowyer, Esq.
McGraw Law Offices
Prosperity, West Virginia
Counsel for Petitioner Kristina G.

Patrick Morrisey, Esq
Attorney General
S. L. Evans, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the West Virginia Department
of Health and Human Resources

Stanley I. Selden, Esq.
Selden Law Offices, LC
Beckley, West Virginia
Guardian *Ad Litem* for D. M.

**Todd A. Kirby, Esq.**
**Kirby Gilbert & Ashley**
**Beckley, West Virginia**
**Guardian *Ad Litem* for Kristina G.**

**CHIEF JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1. "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. pt. 1, *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

2. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re: Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

**Chief Justice Ketchum**:

This abuse and neglect proceeding is before this Court upon the consolidated appeals of Kristina G. (the "mother") and Buddy M. (the "father") who are the biological parents of a child, D. M., born in March 2010.[1] Upon petitions filed by the assistant prosecutor in the Circuit Court of Raleigh County, D. M. was removed from the mother and father and placed in the custody of the West Virginia Department of Health and Human Resources (the "DHHR"). During the proceedings which followed, a separate guardian *ad litem* was appointed for each of the parents and D. M., and each parent was represented by separate counsel.

The case progressed through two adjudicatory hearings to the dispositional hearing conducted in August 2015. The final order was entered on September 25, 2015. The circuit court found D. M. to be an abused and neglected child; terminated the parental rights of both the mother and father; and denied the parents' respective motions for a post-adjudicatory

---

[1] We follow this Court's practice in sensitive matters and will use the descriptive terms "mother" and "father" and will refer to the child by initials only. *See* Rule 40(e), *Rules of Appellate Procedure West Virginia Supreme Court of Appeals* (restricting personal identifiers in abuse and neglect cases).

improvement period. The circuit court ordered that custody of D. M. will remain with the DHHR and that the DHHR shall take immediate steps to achieve D. M.'s permanent placement.

The guardian *ad litem* for D. M. states that the child "is in placement in a DHHR foster care home with relatives" and that the permanency plan calls for adoption, pending the outcome of these appeals. The mother and father indicate that they have been receiving post-termination visitation with D. M. The issue of post-termination visitation is not before this Court.

Both the mother and father challenge the termination of their parental rights and the denial of a post-adjudicatory improvement period. The DHHR and the guardian *ad litem* for D. M. ask this Court to affirm the September 25, 2015, order.

This Court concludes that the circuit court correctly determined that D. M. was an abused and neglected child and that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future. Moreover, the circuit court correctly determined that neither parent established a likelihood of full participation in a post-adjudicatory improvement period. We, therefore, affirm the circuit court's September 25, 2015, order.

2

## I. Factual and Procedural History

In January 2014, the mother and father were granted a divorce. Custody of D. M. was awarded to the mother with visitation granted to the father. No child support was awarded since both parents' employment was sporadic, and both receive supplemental social security income.

On May 14, 2014, the Raleigh County assistant prosecuting attorney filed a petition in the Circuit Court of Raleigh County which alleged that D. M., age four, was an abused and neglected child. The petition stated that the mother had been arrested for allowing D. M. to shoot a .22 caliber firearm, later said to have been within 500 feet of a dwelling house.[2] The petition further stated that the mother told a child protective services worker that the father abused alcohol and was not capable of caring for D. M.[3]

---

[2] Subsequent testimony revealed that the firearm belonged to the boyfriend of the mother's niece. The boyfriend and D. M. held the firearm together while the boyfriend helped D. M. point the firearm to shoot at a can. The mother, who also shot at the can, stated that she believed, at that time, that it was appropriate for the boyfriend to show D. M. how to shoot. The mother further stated that, after shooting at the can, the boyfriend began smoking marihuana.

[3] The petition was filed pursuant to *W.Va. Code*, 49-6-1 [2005], *et seq.*, concerning procedures in child abuse and neglect cases. *See also Supreme Court of Appeals of West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings*. In 2015, the statutory scheme was reorganized under Article 4, Chapter 49 of the Code, entitled "Procedures in Cases of Child Neglect or Abuse," *W.Va. Code*, 49-4-601 [2015], *et seq.*

Based on the petition, the circuit court found that D. M.'s physical well-being was in imminent danger and ordered D. M.'s removal from the mother's residence. Custody of D. M. was transferred to the DHHR. Separate lawyers were appointed for the mother and father, and a guardian *ad litem* was appointed for D. M. Following initial hearings conducted in June and July, 2014, the circuit court directed that custody of D. M. remain with the DHHR and ordered that the mother and father undergo psychological examinations. *See W.Va. Code*, 49-6-4(a) [2005] (authorizing psychological examinations of the parties in child abuse and neglect cases). Thereafter, the mother and father were each provided a guardian *ad litem*.

In February 2015, the Raleigh County assistant prosecuting attorney filed an amended petition which focused on the father. Again asserting that D. M. was an abused and neglected child and that custody should remain with the DHHR, the amended petition alleged that the father's psychological examination revealed that he has an IQ of 48. According to the amended petition, no services can be provided to a parent who possesses an IQ of less than 70, other than visitation, since no curriculum can be provided to such a parent that can be understood and retained. The amended petition further stated: "On page 5 of the psychological examination, [the father] indicates that he is in a relationship with [Sally B.]. [Sally B.] has an extensive CPS [Child Protective Services] history that has involved termination of parental rights of her own children."

4

At an adjudicatory hearing conducted on March 11, 2015, the circuit court heard the testimony of Dr. Clifton R. Hudson, the DHHR's expert witness in forensic psychology in relation to child abuse and neglect cases. Dr. Hudson testified regarding the psychological examinations of both the mother and father. Although Dr. Hudson found the father to be mildly mentally retarded, he discounted what he described as an administrative conclusion that no services can be provided to a parent who possesses an IQ of less than 70. Dr. Hudson stated that, though problematic, minimally adequate parenting is not automatically precluded by an IQ less than 70. Instead, the prognosis should be based on a broad picture of what the parent is capable of, with a consideration of factors such as IQ, personality issues, substance abuse, and response to past interventions. Dr. Hudson concluded that, based on a broad range of factors, the prognosis was poor with regard to whether the father could reliably attain a standard of minimally adequate parenting.

Dr. Hudson found moderate intellectual disability, *i.e.*, a moderate mental retardation, as to the mother. As with the father, Dr. Hudson concluded that, based on a broad range of factors, the prognosis was poor as to whether the mother could reliably attain a standard of minimally adequate parenting. Among the factors considered, Dr. Hudson emphasized the mother's past experience with CPS intervention, her lack of insight, and her poor judgment in allowing D. M. to fire the weapon.

An additional adjudicatory hearing was conducted on April 23, 2015, at which the mother, the father and the father's grandmother testified. Both the mother and father acknowledged that during their marriage, D. M., was removed from their home pursuant to a prior abuse and neglect proceeding. It was alleged in the prior proceeding that D. M., then eight months old, had been given alcoholic beverages. During the April 23, 2015, hearing, both the mother and father denied that they had given alcohol to D. M. and testified that D. M. was returned to them following a successful improvement period. The mother stated, however, that the father had a drinking problem which caused their marriage to fail. The grandmother, age seventy-eight, testified that the father could provide appropriate care for D. M. The grandmother testified further, however, that she once obtained a restraining order against the father for phoning her multiple times to accuse her of causing D. M.'s removal from the home during the prior abuse and neglect proceeding.

At the conclusion of the April 23, 2015, hearing, the circuit court determined D. M. to be an abused and neglected child. The circuit court found that the mother lacked the capacity to understand what could constitute a danger to D. M. Moreover, the circuit court found that the father suffered from a mental deficiency and had a history of alcohol abuse "which places him in a position where he does not have the ability to safely manage the child." The circuit court concluded: "[T]his is the second intervention with regard to this child in his very short life. And the parties were able to complete an improvement period in

6

Wyoming County, but it appears as though they have not learned from the interventions there." Following the hearing, the circuit court entered an order directing that custody of D. M. should remain with the DHHR pending consideration of the parents' respective motions for a post-adjudicatory improvement period.

In letters dated June 8, 2015, and August 14, 2015, a Protective Service Worker of the DHHR's Bureau for Children & Families informed the circuit court that D. M. revealed to his foster father and later during a forensic interview that he had participated in sexual activities with his mother and maternal grandmother. The maternal grandmother is now deceased. The Protective Service Worker recommended that the parental rights of the mother and father be terminated so that D. M. could be adopted.[4]

---

[4] The June 8, 2015, letter from the Protective Service Worker stated:

> The forensic interview was performed on 06/05/15. During the interview [D. M.] stated that his maw maw Connie [D. M.'s maternal grandmother] would let him play with her "tittles." [D. M.] stated that he just asked her if he could play with them and she said yes. [D. M.] also stated during the interview that his mother . . . would get into the bathtub with him and rub his "pee pee."

The August 14, 2015, letter added: "According to the foster parents and the visitation provider, [D. M.'s] behaviors at home have got worse. The family has stated that he is acting out a lot more and he has been asking boys to see their 'pee pee'[.]"

On August 19, 2015, a dispositional hearing was conducted with regard to both the mother and the father, followed by the entry of a final order on September 25, 2015.[5] Finding D. M. to be an abused and neglected child, the circuit court denied the parents' respective motions for a post-adjudicatory improvement period and terminated their parental, custodial and guardianship rights to D. M. The circuit court ordered that custody of D. M. will remain with the DHHR and that the DHHR shall take immediate steps to achieve D. M.'s permanent placement, including the scheduling of a permanency review hearing and the opportunity of the parents to file motions for post-termination visitation.

As reflected in the September 25, 2015, order, the circuit court relied on the psychological evaluations of the mother and the father, the results of which demonstrate moderate or mild mental retardation in both parents. As indicated in the order, the mother's diagnosis manifested in her lack of ability "to understand appropriate responses to health and safety issues," such as the mother allowing D. M. to shoot the firearm. The order further stated that the father lacks the intellectual capacity to properly care for D. M. In short, the circuit court determined that neither parent possesses the capacity to fully participate in a DHHR-approved improvement period.

---

[5] The September 25, 2015, order, twenty-three pages in length, contains extensive findings of fact and conclusions of law.

Nevertheless, the circuit court did not rely solely on the psychological evaluations. As stated above, during the parents' marriage D.M. was removed from the home pursuant to a prior abuse and neglect proceeding. In the September 25, 2015, order, the circuit court confirmed its previous conclusion that, although the parents completed an improvement period in that proceeding, the prior intervention did not resolve the mother and father's parenting deficiencies. The circuit court noted that D. M. revealed that he had participated in sexual activities with his mother and maternal grandmother. *See* n. 4, *supra.* In addition, the circuit court cited evidence of the father's regular use of alcohol and his arrests for possession of a controlled substance, domestic battery and DUI.

The mother and father of D. M. filed separate petitions for appeal in this Court challenging the September 25, 2015, order.

## II. Standards of Review

The standards of review in child abuse and neglect cases are well settled. Syllabus point 1 of *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), states:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the

9

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*Accord* syl. pt. 1, *In re K. P.*, 235 W.Va. 221, 772 S.E.2d 914 (2015); syl. pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

Moreover, within the parameters of statutory authority, a circuit court is authorized to rule on a motion for a post-adjudicatory improvement period, and its decision is reviewed under an abuse of discretion standard. Syllabus point 2 of *In re Lacey P.*, 189 W.Va. 580, 433 S.E.2d 518 (1993), states in part: "It is within the court's discretion to grant an improvement period within the applicable statutory requirements."

Those standards of review facilitate the fundamental principle expressed by this Court in syllabus point 3 of *In re: Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996), as follows: "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." *Accord* syl. pt. 2, *The Matter of B. B.*, 224 W.Va. 647, 687 S.E.2d 746 (2009).

10

## III. Discussion

Pursuant to *W.Va. Code*, 49-6-2(c) [2012], concerning procedures mandated in abuse and neglect cases, a finding that a child has been abused or neglected must be established by clear and convincing proof. Moreover, *W.Va. Code*, 49-6-5(a)(6) [2012], authorizes the termination of parental rights upon a finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future." Subsection (b) of *W.Va. Code*, 49-6-5 [2012], states in part:

> (b) As used in this section, "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" shall mean that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help. Such conditions shall be considered to exist in the following circumstances, which shall not be exclusive: . . . (6) [*subsequently withdrawn by the Legislature*] The abusing parent or parents have incurred emotional illness, mental illness or mental deficiency of such duration or nature as to render such parent or parents incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills.

With regard to a post-adjudicatory improvement period, *W.Va. Code*, 49-6-12(b) [2012], states that, after finding that a child is an abused or neglected child, the circuit court may grant an improvement period when the parent demonstrates by clear and convincing evidence that he or she "is likely to fully participate in the improvement period."[6]

---

[6] The current statutory scheme is similar. *See W.Va. Code*, 49-4-601(I) [2015] (Findings of abuse or neglect must be "proven by clear and convincing evidence."); *W.Va. Code*, 49-4-604(b)(6) [2016] (Parental rights may be terminated where "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially

In the case of *In re Billy Joe M*., 206 W.Va. 1, 521 S.E.2d 173 (1999), parental rights to two children, ages eleven and twelve, were terminated upon the finding that there was no reasonable likelihood that the parents could substantially correct existing conditions of neglect. The parents did not appeal the termination. Rather, the parents challenged the denial of post-termination visitation rights. This Court reversed the denial and remanded the case for implementation of permanency plans and further evaluation regarding the potential for successful post-termination visitation.

---

corrected in the near future."); *W.Va. Code*, 49-4-610(2) [2015] (A post-adjudicatory improvement period may be granted when the parent demonstrates by clear and convincing evidence that he or she is likely to fully participate in the improvement period.).

However, unlike *W.Va. Code*, 49-6-5(b) [2012], the current statute, *W.Va. Code*, 49-4-604(c) [2016], does not include the following within the listed "conditions" explanatory of the phrase "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected":

> The abusing parent or parents have incurred emotional illness, mental illness or mental deficiency of such duration or nature as to render such parent or parents incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills.

Nevertheless, *W.Va. Code*, 49-4-604(c) [2016], retains the language which states that the "reasonable likelihood" of correction phrase means that, "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

12

The parents in *In re Billy Joe M*. suffered from mental deficiencies revealed through psychological examinations. Addressing those deficiencies in the context of the children's permanency plans, this Court stated:

> Where allegations of neglect are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement.

206 W.Va. at 6, 521 S.E.2d at 178. Significantly, this Court noted, in *In re Billy Joe M*., that "the social services and legal systems have left these children with their parents for eleven and twelve years, with resultant strong emotional bonds." 206 W.Va. at 8, 521 S.E.2d at 180. The current proceeding was initiated when D. M. was age four.

*In re Billy Joe M*. was discussed by this Court in *In re Maranda T*., 223 W.Va. 512, 678 S.E.2d 18 (2009). *Maranda* involved evidence of sexual misconduct by the father and possibly by other male family members against a seven-year-old child. There was also evidence that the father abused alcohol. Consequently, the father's parental rights were terminated. Further evidence, in *Maranda*, indicated that the mother was of low intelligence, with limited insight regarding appropriate behaviors and boundaries for children, and was

13

unable to assimilate the skills needed to care for her child. In *Maranda*, the mother appealed the termination of her parental rights and the denial of her motion for a dispositional improvement period. Concluding that the appeal was without merit, this Court, in *Maranda*, stated:

> The case currently before this Court for consideration involves both neglect and sexual abuse. *Billy Joe M*. anticipated such a case and cautioned that "[w]here the charge is abuse as opposed to neglect, the obligation to provide remedial services is far less substantial." 206 W.Va. at 6 n. 12, 521 S.E.2d at 178 n. 12. * * * Importantly, the mother's own testimony showed her inability to realize the impact of these allegations, and her request to allow the father back into the home for her own support in case of a medical emergency illustrated her inability to appreciate the gravity of the situation and to protect [her child] from a risk of continued sexual abuse.

223 W.Va. at 519, 678 S.E.2d at 25.

Here, the parental rights of the mother and father to D. M. were terminated upon the finding of the circuit court that clear and convincing evidence established no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future. Moreover, the circuit court found that neither parent is likely to fully participate in an improvement period. Significantly, the record before this Court demonstrates that the mental deficiencies of the mother and father, revealed through the psychological examinations, constitute only one among several components which formed the basis of the circuit court's rulings.

14

Nevertheless, the psychological examinations of D. M.'s parents should be considered. The mother, for example, exhibited a lack of insight and poor judgment in thinking it appropriate for D. M. to shoot the firearm. However, as Dr. Hudson made clear, the prognosis as to both parents must be based upon a broad range of factors, not just a low IQ score.[7] Accordingly, as the circuit court pointed out, this is the second intervention with

---

[7] At the March 11, 2015, adjudicatory hearing, Dr. Hudson testified as follows with regard to the mother:

> Q. And I notice you made a determination that, based upon the information you had available, that she has extreme difficulty making judgments with respect to treatment of herself and the child; is that correct?
> A. Yes, she had very significant difficulties on the Independent Living Scale, which is an adaptive behavior measure that looks at her ability to sort of take care of herself and a home on a daily basis. And then there did appear to be a repetitive history of problems in parenting judgment that had somehow led to CPS intervention.

Dr. Hudson testified with regard to the father:

> Q. Did you make any determinations with respect to whether or not you believe that [the father] could effectively provide a safe environment and home for his child [D. M.], if the child was returned to him?
> A. Prognosis in that respect was assessed to be poor based on several factors. One of those would be that he presented as very defensive in the current evaluation regarding past problems that he had had. He denied, for example, the substance abuse or domestic violence concerns that were presented in the collateral documentation. He also has been through some prior intervention that did not appear to resolve the problems.
> And mild mental retardation, while it doesn't preclude minimally-adequate parenting, can certainly impede the process of making significant changes when those need to be made. Additionally, personality issues tend to be rather difficult to change. So for all those reasons, prognosis was assessed to be relatively poor for reliably attaining a standard of minimally-adequate parenting.

15

regard to D. M. in his very short life, and, although the parents completed the previous improvement period, they apparently did not learn from that intervention. Moreover, the association of the mother and father with other troubled individuals is problematic. The amended petition alleges a relationship between the father and an individual with an extensive CPS history "that has involved termination of parental rights of her own children." Moreover, the circuit court cited evidence of the father's regular use of alcohol and his arrests for possession of a controlled substance, domestic battery and DUI. The father has also exhibited difficulty in complying with D. M.'s visitation schedule.

At the time of the shooting incident, the boyfriend of the mother's niece was using marihuana. In addition, the mother initially focused her appeal before this Court largely on D. M.'s maternal grandmother, now deceased, another individual who caused concern. According to the mother, the circuit court committed error by terminating her parental rights and denying an improvement period without considering placement of D. M. with the mother and the maternal grandmother. The mother contends that the rulings of the circuit court were entered in the absence of a proper study of the maternal grandmother's home and without corroboration of either D. M.'s disclosure of sexual misconduct or the maternal grandmother's history of CPS referrals. Inasmuch as the maternal grandmother died during the pendency of these appeals, those issues are now moot.

However, D. M. revealed the sexual activities to both his foster father and during a forensic interview, and it was reported that he has made inappropriate remarks to other children. *See* n. 4, *supra*. Thus, the relationship of the mother with respect to the maternal grandmother is worth noting. The September 25, 2015, order of the circuit court states:

> The Department was told through an anonymous call that [the maternal grandmother] had substantial CPS [Child Protective Services] involvement in other states. The Department conducted a CPS history search in West Virginia and found upwards of 20 CPS referrals relating to families involving [the maternal grandmother]. * * * The Court does acknowledge that [the mother] has received substantial assistance in raising D. M. from [the maternal grandmother]. This causes the Court substantial concern because of the extensive CPS history with families involving [the maternal grandmother].

In *Maranda*, the mother's request to allow the father back into the home "illustrated her inability to appreciate the gravity of the situation." Similarly, the mother's original request in the current proceeding for placement of D. M. with her and the maternal grandmother is equally troublesome, as reflective of the mother's bad judgment, and lends support to the circuit court's rulings.

Syllabus point 1 of *In Re: R. J. M.*, 164 W.Va 496, 266 S.E.2d 114 (1980), states, in part, that "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened." The September 25, 2015, order contains extensive findings of fact and conclusions of law and reaches a well-reasoned conclusion. Consequently, this

17

Court is of the opinion that the circuit court correctly determined that D. M. was proven to be an abused and neglected child and that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future. Moreover, the circuit court correctly determined that neither parent established a likelihood of full participation in a post-adjudicatory improvement period.

## IV. Conclusion

Upon all of the above, the September 25, 2015, order of the Circuit Court of Raleigh County is affirmed. In so holding, we note that, although the issue of post-termination visitation is not before this Court, we made clear in *Maranda* that visitation in abuse and neglect cases "should not interfere with the need for stability and a permanent placement for the child." 223 W.Va. at 520, 678 S.E.2d at 26.

Affirmed.